**STATE of Minnesota, Respondent,**

v.

**Robert John KIVIMAKI, Appellant.**

**No. C6-83-387.**

Supreme Court of Minnesota.

March 16, 1984.

C. Paul Jones, State Public Defender, Mark Anderson, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Alan Mitchell, County Atty., Duluth, for respondent.

TODD, Justice.

Robert Kivimaki was charged and convicted of first degree murder. On appeal he challenges the refusal of the trial court to suppress confessions he made while in custody. He alleges that he was deprived of his right to counsel under both the fifth and sixth amendments of the United States Constitution. We affirm.

Shirley Kykyri was brutally murdered in the city of Eveleth, Minnesota on December 27, 1981. Robert Kivimaki was at that time a suspect in an alleged rape of the victim which had occurred two days earlier. On the day of the murder he voluntarily appeared at police headquarters to be photographed regarding the rape incident. On December 29, 1981 the body was discovered. The police again questioned Kivimaki and his girlfriend, Grace Campbell, who lived across the hall from the victim. The police did not disclose that the body had been discovered. Kivimaki and his girlfriend were released and on December 31, 1981 they drove to Texas.

During the next eight weeks, Kivimaki and Campbell spent about a month in a rented apartment in Dallas and then travelled to the west coast and eventually to Las Vegas. Kivimaki telephoned his parents twice and sent a letter expressing remorse for "what I have done." The letter, introduced at trial, also stated, "I don't want to rot in prison. I want to kill myself for what I have done. That's what I deserve." The letter was sent just before Kivimaki attempted suicide by slashing his wrists and feet.

On February 24, 1982, police located Kivimaki and Campbell in Las Vegas. The woman had wired her parents for money. Detective James Bozicevich of the Virginia Police Department and Floyd Bowman of the Minnesota Bureau of Criminal Apprehension arrested the pair at the Western Union Office pursuant to a warrant.

After their arrest, Kivimaki and Campbell were taken to separate offices in the Las Vegas Police Department. In a tape recorded statement after he received a *Miranda* warning, Kivimaki denied any involvement in the rape and murder and talked only about the trip from Eveleth. He said he left Minnesota because he was afraid of being framed for the crimes against Kykyri. Campbell, meanwhile, told agent Bowman that she had witnessed the murder of Kykyri and helped Kivimaki clean up afterward.

Kivimaki was questioned by Bowman again the next day after he was informed of his constitutional rights. He did not yet know that his girlfriend had implicated him in the murder and he again denied involvement in any criminal activity. At the end of the interview, Bowman suggested it would be "easier" on appellant and everyone if he told what he knew. During this time Kivimaki was kept in a padded cell without clothing as a precaution against suicide. He testified that they had no money for food and the day before they were picked up he had fainted.

Kivimaki and Campbell waived extradition and arrangements were made to return them to Minnesota. On February 26, police drove them to the Las Vegas airport. This was the first time since their arrest that the couple had been together and they were happy to see each other. During the ride, Campbell whispered to Kivimaki, who was seated next to her, that she had told police what had happened. She suggested, "you better get your things together and tell them what happened." After a pause, Kivimaki told Bowman he wanted to talk. Agent Bowman delayed questioning him until they were all seated on the airplane. In the airplane, Kivimaki said he had wanted to tell Bowman earlier that day what had happened.

After being advised of his rights, Kivimaki gave a taped statement in the airplane confessing in detail that he had sexual intercourse with Kykyri and murdered her two days later. He claimed the intercourse was consensual.

In the airplane statement and in a more detailed confession given the following day at the Crime Bureau office in St. Paul, Kivimaki related that he killed Kykyri out of fear that she would identify him as her rapist. He told how, after admitting to Campbell that he had raped Kykyri, he decided to kill Kykyri to get her out of the way. He claimed his girlfriend chose a steak knife from her kitchen and agreed to knock on Kykyri's door since they knew the victim would not open her door for Kivimaki.

Kivimaki admitted changing into Campbell's clothes and donning a pair of work gloves. He then waited outside Kykyri's door. When Kykyri answered, Campbell sprayed the woman with mace. Kivimaki went into the apartment and the victim begged him not to do anything. He then put his finger in her mouth to keep her from screaming. While Campbell looked the other way, Kivimaki cut the victim's throat and stabbed her repeatedly. He later recalled cutting her throat to the neckbone.

Afterward, the two returned to Campbell's apartment, and put their bloody clothes into a paper bag. They cleaned up the kitchen, then drove to a rural area, stopping to buy gasoline at a service station. Kivimaki then doused the clothes with gasoline and set them on fire. Kivimaki also recalled throwing the knife out the window of his truck.

After statements were taken from the suspects in St. Paul, they were driven back to Virginia. En route, Kivimaki pointed out the places where he burned the clothes and where he threw the knife. A police detective later recovered fragments of women's clothing and work gloves. The steak knife was never found.

At trial Kivimaki testified that the account of the murder he gave to police was fabricated by Campbell. He claimed she committed the murder in a jealous rage after learning her boyfriend had had sex with Kykyri. He agreed to tell her story so that she would marry him and they would not be able to testify against each other. Physical evidence introduced at trial did not establish that Kivimaki had been in the victim's apartment.

On March 18, 1982, a St. Louis County grand jury indicted Kivimaki and Campbell, charging them each with three counts of first degree murder. Following a jury trial that began on November 15, 1982, Kivimaki was found guilty as charged.

The issue presented is whether the admission in evidence of Kivimaki's confessions to the police after he had been charged with first degree murder violated his fifth or sixth amendment rights.

■■■ 1. The fifth amendment to the United States Constitution in pertinent part provides: "No person ... shall be compelled in any criminal case to be witness against himself." This protection is applicable to state court proceedings through the fourteenth amendment. *Malloy v. Hogan,* 378 U.S. 1, 11, 84 S.Ct. 1489, 1495, 12 L.Ed.2d 653 (1964). The Minnesota Constitution contains an identical protection. Minn. Const. art. I, § 7. In order for a statement taken from an accused during custodial interrogation to be admitted, the prosecution must prove that the accused knowingly and intelligently waived his right against self-incrimination, *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966), and that the statement was freely and voluntarily made. *See Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963). In *State v. Linder,* 268 N.W.2d 734 (1978), the court outlined the analysis to be followed in determining the voluntariness issue:

In an ordinary case if the prosecutor shows that the warning was given and that defendant stated he understood his rights and then gave a statement, the state will be deemed to have met its burden of proof, unless there is other evidence indicating that there was no knowing, intelligent, and voluntary waiver.

However, if there is other such evidence, then the trial court must make a subjective factual inquiry to determine whether under the totality of the circum-

stances the waiver was knowing, intelligent, and voluntary. This is the same kind of inquiry basically that is made to determine whether a statement is "voluntary" within the meaning of the traditional voluntariness requirement. [citation omitted]. Factors to be considered include age, maturity, intelligence, education, experience, ability to comprehend, lack of or adequacy of warnings, length and legality of detention, nature of interrogation, physical deprivations, limits on access to counsel and friends, and others.

268 N.W.2d at 735 (citations omitted).

Here, it is undisputed that the *Miranda* warning was given at all appropriate times. Examination of the record leads us to conclude that Kivimaki knowingly and intelligently waived his right against self-incrimination. Kivimaki, a high school graduate, initiated the conversations which led to his giving police detailed confessions of the crimes. Agent Bowman did not pressure Kivimaki to talk; in fact, he delayed questioning until after they boarded the airplane. He also ceased questioning Kivimaki during a later confession when Kivimaki said he was too tired to give a statement.

The trial court found, and we agree, that the State made no promises of leniency to Kivimaki. From the totality of the circumstances, we conclude there is no violation of appellant's fifth amendment rights.

■ 2. Under the sixth amendment Kivimaki is guaranteed assistance of counsel for his defense. This right attaches when adversary judicial proceedings have begun. *Brewer v. Williams*, 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977); *Giddings v. State*, 290 N.W.2d 595, 597 (Minn.1980). Here, Kivimaki had been charged with first degree murder by complaint in Minnesota. Though Minn.R. Crim.P. 17.01 (amended 1983) required prosecution by indictment for offenses punishable by life imprisonment, there is no doubt that the sixth amendment right had attached.

This court and the United States Supreme Court have stated repeatedly that the sixth amendment prohibits the government from eliciting incriminating statements unless a valid waiver is obtained. *Brewer v. Williams*, 430 U.S. at 404, 97 S.Ct. at 1242; *State v. Sufka*, 295 N.W.2d 665, 667 (Minn.1980). The debatable point in many cases, and the pivotal issue in this case, is whether and by what standard an accused may waive his right to counsel.

■ In prior cases this court has examined the record to determine whether the particular circumstances surrounding the case at the time of the interrogation show that the defendant intentionally relinquished his right to have counsel present before questioning is started. *Giddings v. State*, 290 N.W.2d at 597. The prosecution has the burden of proving the right was waived and the court should indulge in every reasonable presumption against waiver. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). In sustaining its burden, the government must show not only that the accused understood his right to counsel but also that he abandoned the right. *Id.*

This court has refused to adopt a per se rule that uncounseled statements obtained from an accused are inadmissible regardless of any waiver. *Giddings v. State*, 290 N.W.2d at 597 n. 3. The United States Supreme Court has refused to hold that waivers of the sixth amendment right to counsel must be judged by a standard higher than that applicable to fifth amendment right to counsel waivers. As recently as May 1983 the Eighth Circuit Court of Appeals concluded that the petitioner had knowingly and intelligently waived his sixth amendment right to have counsel present during a postpolygraph examination. *Fields v. Wyrick*, 706 F.2d 879, 881 (8th Cir.), cert. denied —— U.S. ——, 104 S.Ct. 556, 556, 78 L.Ed.2d 728 (1983).

■ The Eighth Circuit in that case held that the validity of a waiver of either the fifth or sixth amendment right to counsel is judged by essentially the same standard. *Id.* at 881. That standard is whether under the facts of the case there was a voluntary, knowing and intelligent abandonment or

relinquishment of a known right or privilege. 706 F.2d at 881.

We agree with the rationale of the *Fields* decision. We recognize that different policies underlie the fifth and sixth amendment rights to counsel. But use of the traditional standard for determining waiver does not contravene these policies. Rather, the standard requires courts to closely examine the context of the purported waiver and judge whether the accused was aware of the particular right involved and understood the seriousness of his legal position.

The moment a defendant's sixth amendment right has attached, the prosecution's role shifts from investigator to accuser. Any questioning of an accused is suspect after the State has enough evidence to charge him with a crime. However, the standard—voluntary, knowing and intelligent abandonment or relinquishment of a known right or privilege—remains the same. The standard is broad enough to encompass all of the constitutional rights involved when the police elicit incriminating statements from an accused.

Affirmed.