STATE of Minnesota, Respondent,

v.

Courtney Bernard CLARK, Appellant.

No. A06–1765.

Supreme Court of Minnesota.

Sept. 13, 2007.

John M. Stuart, State Public Defender, Paul J. Maravigli, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Lori Swanson, Attorney General, Susan Gaertner, Ramsey County Attorney, Thomas R. Ragatz, Assistant Ramsey County Attorney, St. Paul, MN, for Respondent.

## OPINION

ANDERSON, Paul H., Justice.

Courtney Bernard Clark was convicted in Ramsey County for murdering Rodney Foster and attempting to murder Foster's girlfriend, B.B., while committing or attempting to commit aggravated robbery, kidnapping, and criminal sexual conduct. At Clark's trial, the state introduced over Clark's objection three recorded interviews between Clark and the police. In the first and second interviews, Clark denied involvement in the charged offenses. In the third interview, Clark admitted tying up Foster and B.B. and robbing Foster, and he stated that Foster died "by accident." During all three interviews, Clark denied having sexual relations with B.B. on the date in question. Clark's trial testimony was largely consistent with his statements during the third interview and directly opposed to the testimony of B.B., the state's primary witness. On appeal, Clark argues that the district court erred on several grounds when it admitted the recorded interviews and when it admitted, for substantive purposes, Clark's prior conviction for criminal sexual conduct. We affirm.

Appellant Courtney Bernard Clark was indicted in Ramsey County for the murder of Rodney Foster and attempted murder of Foster's girlfriend, B.B. Clark pleaded not guilty to all eight counts of the indictment.[1] Clark was subsequently tried before a Ramsey County jury, and B.B. was the state's primary witness.

### B.B.'s Testimony

B.B. testified that she had only known Clark for a few days as of the date of Foster's murder—Saturday, July 16, 2005. Several days before that Saturday, Foster learned that Clark did not have a home and invited Clark to stay at Foster's apartment.[2] While spending time at Foster's apartment, Clark apparently observed Foster's drug dealer, "Taboo," packaging heroin for sale and selling heroin to Foster. Clark also spent time getting high with Foster and B.B. on drugs that Foster gave him.

B.B. and Foster were alone in the apartment and watching a movie in the living room early on Saturday when Clark, Foster's roommate, and the roommate's friend D.T. arrived at approximately 3 a.m. The

---

1. The indictment charged Clark with first-degree murder while committing or attempting to commit aggravated robbery, kidnapping, or first- or second-degree criminal sexual conduct, and second-degree intentional murder with respect to Foster, and attempts to commit each of these four crimes with respect to B.B. See Minn.Stat. §§ 609.185(a)(2),(3); 609.16, subd. 1(1); 609.17 (2006).

2. B.B. moved in with Foster approximately two months before Foster's murder. In the interest of simplicity, however, we use descriptions such as "Foster's apartment" and "Foster's bedroom."

roommate and D.T. left soon thereafter. Clark eventually asked Foster for some heroin. When Foster told Clark he did not have any, Clark became angry. At Foster's request, Clark then took a seat on the couch and continued to converse with Foster. B.B. testified that she fell asleep while Foster and Clark were talking.

B.B. awoke to see Clark standing over her with a gun, telling her to get on her stomach and put her hands behind her back. Clark then ordered Foster, who was lying on his left side, to get on his stomach. Clark bound B.B.'s wrists and feet, and at some point placed a sock in her mouth. B.B. was unable to see Foster but she deduced, based on comments Foster made to Clark, that Clark had also bound Foster's wrists. Clark then asked where the drugs and money were located. Foster told Clark he would find the items in Foster's bedroom. Clark went to Foster's bedroom and returned with drugs and money.

Sometime thereafter, Clark carried B.B. from the living room into the bathroom and left her on the bathroom floor in the dark. B.B. testified that she could hear Clark moving around the apartment searching through papers and clothes. After about three hours, she heard a muffled cry from Foster, who had apparently remained in the living room. Soon thereafter, Clark entered the bathroom briefly to reassure B.B. "that everything was going to be all right."

Clark returned to the bathroom several minutes later and said, "Foster, do you care if I fuck your bitch?" B.B. heard no response from Foster and Clark then said, "Did you hear that? * * * He doesn't care." Clark then dragged B.B. into Foster's bedroom where he placed her, still bound and gagged, on her back on an air mattress. Clark then partially removed his clothing and pulled B.B.'s pajama pants to her ankles, and vaginally raped her for approximately 10 minutes. When the rape was over, B.B. saw Clark carry a condom into the bathroom. She then heard him flush the toilet and turn on the water. Clark returned with a washcloth and scrubbed B.B.'s genital area. He then went back to the bathroom, ran some water, and returned with the washcloth again. After he washed B.B. a second time, Clark pulled up B.B.'s pants and dressed himself.

Clark next turned B.B. onto her stomach on the air mattress. From this position B.B. could see Foster's feet protruding from a laundry bag on the floor, which caused her to panic. Clark then told B.B. that Foster was dead and said, "Now it's time for the grand finale." Clark proceeded to kneel over B.B. and to place and hold a plastic bag over her head. He told B.B. to breathe and "[j]ust let go." Although B.B. was still bound and gagged, she was able to free her left hand and tear the bag off her face, at which point Clark became angry and swore at her. A minute or so later, Clark stood up, looked out the windows, and started snorting heroin. Shortly thereafter, he offered B.B. some crack cocaine by removing the gag and placing a lighted crack pipe to her mouth. After B.B. smoked the pipe, Clark replaced the gag, rebound her wrists, and rolled her up in some bed sheets.

B.B. observed Clark try without success to throw Foster's body out the bedroom window. Clark then dragged the body out of the bedroom. B.B. ultimately heard a door in the apartment shut, then Foster's vehicle—a white, SUV-type truck—being started and a squealing of tires. Five to seven minutes later, Clark returned to the apartment. He unwrapped B.B. and unbound her feet and hands. He then forced B.B. to leave the apartment with him and threatened to kill her mother and children. At the time Clark made these threats, he

was holding B.B.'s driver's license, which listed the address where her mother and children resided.

When B.B. entered the apartment building hallway with Clark, she saw a neighbor she recognized. As she passed this neighbor, B.B. mouthed the words "Help me." The neighbor kept walking, and B.B. followed Clark out of the apartment building. Some people whom B.B. recognized were sitting on the front stairs of the building. She made eye contact with one of them as she followed Clark to Foster's truck, which was parked in the building's driveway. A neighbor then came out of the building and followed Clark and B.B., and as B.B. reached the truck, the neighbor grabbed B.B.'s arm and said to Clark, "She doesn't look like she wants to go with you." B.B. then turned and ran back into the building. B.B. testified that she ran through the building's second and third floor hallways and knocked on every apartment door as she ran by, not waiting to see if anyone would answer. She was ultimately admitted into a third floor apartment, and one of the apartment's occupants called 911.

### Other Witnesses for the State

A Sexual Assault Nurse Examiner (SANE nurse) who examined B.B. in the early afternoon on July 16 testified that she found bloody discharge on B.B.'s cervix, suggesting an injury consistent with rough or forced sexual intercourse. A woman who was staying with her daughter in Foster's apartment building at the time of the murder testified that she saw B.B. leaving with Clark and mouthing the words "Help me." The woman's daughter testified that she and several other persons were gathered on the front steps of the apartment building when she saw Clark and B.B. emerge on the morning of July 16. The daughter said that she told Clark to let B.B. go. She also said that she saw Clark leave the scene in a white truck.

A forensic scientist from the Minnesota Bureau of Criminal Apprehension testified that Clark's DNA was not found on evidence seized from the crime scene, including washcloths, bed sheets, a condom wrapper found in the bedroom, semen stains on the pants B.B. was wearing before and after the rape, and B.B.'s driver's license. The scientist also testified that Clark's DNA was not found on biological samples taken from B.B. by the SANE nurse.

Several witnesses testified that they saw Clark in the Lake Harriett area of Minneapolis on the morning of the next day—Sunday, July 17. One of these witnesses saw Clark in a parking lot near the Lake Harriett concessions building, looking lost or confused. This witness observed Clark standing about 30 yards from a white truck, which was the only vehicle in the parking lot at that time. Another witness, who resided in the area, testified that Clark drove a white SUV into his driveway and onto the yard of a neighbor. While the witness was talking with Clark, the neighbor emerged from her house and said that she had called the police. Clark then sped from the scene in the SUV. One of Clark's cousins testified that Clark visited her that Sunday, and he was driving a white truck that she had never known him to drive. The cousin noticed that Clark had "a nice amount of money"—more than she had ever seen Clark carry.

A Washington County police officer testified that one week later, in the early morning hours of July 24, Clark was arrested after he drove a station wagon in the wrong direction on a highway exit ramp and then failed to pull over for the police. Clark ultimately crashed into some large cement barriers and was taken to the Ramsey County Law Enforcement Center.

A Minneapolis police officer testified that during the evening of July 24, the police responded to a radio call indicating that a body had been discovered near some railroad tracks in southeast Minneapolis. The body was ultimately identified as Foster's. Two of the responding officers testified that they observed beaten-down vegetation near the body, indicating that a vehicle had driven in the area.

A forensic pathologist with the Hennepin County Medical Examiner's Office testified that Foster's body was partially buried under a pile of fresh dirt that "clearly didn't belong there" and was not part of the native landscape. The body was "packaged" in a laundry bag and two plastic bags covered Foster's head. A ligature surrounded Foster's head, holding a gag in place, and other ligatures bound his wrists and ankles. The pathologist told the jury that in his opinion, Foster's death was a homicide. He said that Foster died of asphyxia, which could have been caused by someone placing bags over Foster's head or obstructing his pharynx.

A University of Minnesota botanist testified that four plant fragments obtained from the undercarriage of Foster's truck were fragments of species present at the scene where Foster's body was found. The botanist said that two of the four species are not commonly found in the southern part of Minnesota.

### Clark's Recorded Statements

St. Paul Police Sergeant Steven Frazer, the primary investigator on Foster's case, testified regarding three interviews he conducted with Clark after Clark was arrested—two on July 26 and one on August 3. Frazer said that he conducted the interviews together with Minneapolis Police Officer Michael Doran, for whom Clark had worked as a paid informant. The state played for the jury an audiotape of the first interview and videotapes of the second and third interviews.

During the first interview, Clark showed surprise on learning that Foster was dead. Clark acknowledged that he was in Foster's apartment with several other persons on the night Foster was murdered, but he vehemently denied that he assaulted Foster or that he witnessed any assault against Foster. Clark asserted that he did not have sex with B.B. that night, and that he had not driven Foster's truck after Foster died. During the second interview, Clark told the officers that he saw a mutual acquaintance "snap" during an argument with Foster and choke Foster to death. He said he did not know that Foster had been tied up. He admitted driving Foster's truck away from the apartment after the murder but denied that Foster's body was in the truck.

During the third interview, Clark ultimately admitted that he tied up and gagged Foster and tied up B.B. in order to rob Foster of his drugs. Clark denied intending to kill Foster and said that Foster died accidentally from a heart attack or drug overdose after Clark gagged him. Clark said that he placed a plastic bag over Foster's head after he knew that Foster had died. Later in the interview, Clark stated that the plastic bag was inadvertently caught up with Foster's body when it was wrapped in a laundry bag. Clark said that a person named "Boo"[3] and other persons "disposed of" Foster's body. He said he did not know where Foster's body was taken. He again denied having sex with B.B. or placing a bag over her head. Finally, he admitted leaving the apartment in Foster's truck.

---

3. Boo and Taboo are different persons.

## Clark's Testimony

Clark testified on his own behalf. Clark said that he stayed overnight at Foster's apartment several nights before and including July 16. He began staying there when he realized that Foster's apartment had become a hub for certain drug-related activities that he was being paid to help Officer Doran investigate. He was using drugs during this time period, partly to avoid raising the suspicions of persons under investigation.

According to Clark, Foster's roommate and D.T. brought Clark to Foster's apartment during the early morning hours of July 16, but they eventually left, at which point Clark was alone with Foster and B.B. Clark asked Foster for drugs, but Foster refused. Clark then sat on the couch and "had words" with Foster. Sometime later that morning, Clark and B.B. walked into Foster's bedroom. Clark saw approximately 380 grams of heroin in the bedroom, and B.B. told him about cocaine located elsewhere in the apartment.

Clark testified that he then decided to take the drugs in Foster's apartment as part of a set-up. He believed that by "stealing" the drugs, he would motivate Boo and others to pursue him with some guns that Doran wanted to confiscate. Taboo was in Foster's apartment by the time Clark decided to take the drugs, and Taboo knew what Clark was planning to do. Clark used a kitchen knife to threaten Foster and B.B. He tied up and gagged Foster, and also tied up B.B. to "make it look good for Foster." Clark said he did not have any guns during the incident. He also said he told B.B. beforehand that he planned to steal the drugs, and B.B. did not attempt to stop him.

Clark stated that after he tied up Foster and B.B., he began searching for drugs. He then carried B.B. to Foster's bedroom after she signaled that she wanted to be moved. B.B. slipped out of the ligatures once she was in the bedroom, and Clark did not retie her. B.B. then told Clark where to find the drugs. Clark ultimately bagged four kilograms of cocaine and obtained a ride from an acquaintance of Taboo's. He said that when he left, Taboo was still at the apartment. Clark brought the drugs to a Ross Street residence and returned to Foster's apartment about 10 minutes later, at around 6 or 7 a.m. The person who gave Clark a ride did not stay, and Taboo left the apartment shortly after Clark returned.

Clark testified that in an effort to "check on" Foster, he slapped Foster's face, but Foster did not move. Clark said he then realized that Foster was dead. Clark sat and cried for approximately a half hour while thinking about what he had done. Clark then told B.B., who had been in the back of the apartment getting high, what had occurred. B.B. gave Clark the keys to Foster's truck so Clark could drive to a public telephone to call Boo.[4] When Clark returned 15 minutes later, he found that B.B. had tried to "make the house ransacked." Boo arrived at Foster's apartment at 8 or 9 a.m. with two men Clark did not know. Boo told Clark he would "take care of" things. Clark said he initially helped look for something in the apartment to "put [Foster's body] in," but he then became too upset to help, and he went to the back of the apartment with B.B.

Clark said that sometime later, he went to use the bathroom and when he emerged, Boo was gone, and he had appar-

---

4. Clark initially testified that he called Taboo, but moments later, he said that he "had to keep calling Boo for him to pick up his phone." The subsequent exchange between Clark and his lawyer confirms that Clark meant to say "Boo."

ently taken Foster's body with him. Clark and B.B. then left the apartment together. When Clark and B.B. reached Foster's truck, B.B. changed her mind and walked back to the apartment building after a neighbor said to Clark, "She don't want to go with you." After asking B.B. if she was sure she wanted to stay and seeing B.B. start "breaking down," Clark drove to the Ross Street residence alone. He then moved the drugs from that residence to a Minneapolis home that Doran had previously searched. He left the drugs at the Minneapolis home and then went to a public telephone to call Doran. Doran did not answer his telephone, but Clark did not leave a message because what had happened was "too serious."

Clark testified that he drove into the yard of the residence near Lake Harriet on July 17 in order to avoid being caught by some men who were chasing him because of the drugs he had stolen. He then drove to the Lake Harriet park area to use a pay telephone to call a cousin. When he told the cousin what had happened, the cousin told him, "I already know. I[saw] it on the news." The cousin drove to Lake Harriet to give Clark a ride, and Clark left Foster's truck in the Lake Harriet parking lot.

Clark said he lied to the police when he was interviewed on July 26 because he was going through withdrawal sickness and because he wanted to speak only with Doran, not Frazer. According to Clark, Doran had visited him in his cell before the first interview and had instructed him not to speak about the investigation in which Clark was serving as a paid informant. Clark said he told the truth when he spoke with Doran alone during the August 3 interview. He said that he did not intend to kill Foster, he did not place a bag over Foster's head and suffocate him, and he did not have any sexual relations with B.B.

He said he did not give the police all of the details on August 3, that he gave to the jury because of the instruction he had received from Doran regarding Doran's investigation.

### State's Rebuttal Witness

After the defense rested, the state called Doran as its sole rebuttal witness. Doran confirmed that Clark worked for him as a paid informant in the summer of 2005. The last time Doran had contact with Clark before Foster's murder was on July 13, and his first contact with Clark after the murder was at the Ramsey County Law Enforcement Center (LEC) on July 26. Doran said he did not speak with Clark in his cell before he and Frazer interviewed Clark. Doran indicated that all conversations with Clark after Foster's murder took place in Frazer's presence, except for the few minutes in which Doran and Clark were alone during the August 3 interview and a later September interview that was not previously discussed at trial.

### Clark's Motion to Suppress Statements to the Police

Before Clark's trial began, he moved the district court to suppress the statements he made during his interviews with Frazer and Doran on July 26 and August 3. Clark argued that when he made the statements he was mentally incapacitated as a result of heroin withdrawal, and therefore, he did not knowingly, voluntarily, and intelligently waive his rights to remain silent and to have his lawyer present. He also argued that his statements were the product of coercion, and that the state violated his Sixth Amendment right to counsel and our case law respectively by interviewing him without his lawyer present and without sufficient notice to his lawyer. The court conducted a pretrial hearing on Clark's motion and heard testimony from several witnesses.

*First July 26 Interview*

The first interview on July 26 took place at the LEC before Clark's arraignment and lasted for approximately 40 minutes. Clark was not yet represented by counsel. At the start of the interview, Frazer and Doran obtained a signed *Miranda* waiver form from Clark. Clark wrote his initials next to each of four points on the form, indicating that he understood his *Miranda* rights. Frazer said that although Clark appeared to be in a drug withdrawal state during this interview, he was completely appropriate and timely with his answers.

Clark testified that before the first interview on July 26, Doran visited him in his cell for about 10 minutes and told him not to discuss with anyone his work as a confidential informant. Clark said that Doran also told him "I'm your attorney. I can prove [sic] better than your attorney. Just do what I'm telling you to do." Clark stated that Doran also said he would "take care of everything," which Clark interpreted as a promise "to help [him] in some kind of way."

*Second July 26 Interview*

Frazer testified that at some point after the first interview ended but before Clark was arraigned, Clark told LEC staff that he wanted to speak with the officers after his arraignment. Frazer said that by the time he learned of Clark's request, he knew that a lawyer had been appointed to represent Clark and therefore, he had to follow certain procedures before conducting another interview. Frazer contacted Assistant Ramsey County Attorney Charles Balck for advice on how to proceed. Balck told Frazer that he would contact the public defender's office and get back to Frazer. Balck subsequently contacted Frazer before the arraignment hearing ended and told him that the officers could speak with Clark if Clark initiated contact because the public defender's office was "aware of the situation." Balck testified that he could not remember speaking to Frazer on July 26 but that every time he learned about a request by Clark to speak with the police, he "contacted, or attempted to contact" someone at the public defender's office.

Tom Handley, who was appointed Clark's public defender at Clark's arraignment hearing, testified that he spoke with Balck by telephone on the day of the arraignment or the next day. Handley said that during this conversation, he told Balck that it would "be a better practice to not [have the officers] speak to Mr. Clark, just [to] avoid any [legal] problems down the road." Handley said that Balck might have told him on the day of the arraignment that the police planned to speak with Clark.

Frazer and Doran next met with Clark after Clark's arraignment. The interview lasted approximately 50 minutes and began with the following exchange:

> Frazer: Do you remember this paper we went over with your rights on it earlier?
>
> Clark: Yeah.
>
> Frazer: And you asked us to talk to you this time, right? You want to talk to us?
>
> Clark: Yeah.

Shortly thereafter, Frazer reviewed with Clark the *Miranda* waiver Clark signed earlier that day, ending with the following statements:

> Frazer: You have the right to talk to a lawyer and to have the lawyer with you during any questioning. If you cannot afford a lawyer one will be appointed for you and you may remain silent until you have talked to a lawyer. You remember [these rights] from earlier when we talked?

Clark: Yeah. I just talked to him. He's pissed off.

\* \* \*

Frazer: Having these rights in mind are you willing to talk to us like you asked us downstairs—

Clark: Yeah \* \* \* [b]ut right now my mind ain't right. \* \* \* I gotta get some detox. \* \* \* It's coming stronger and stronger, man.

Frazer then asked if Clark wanted him to check on the nurse's whereabouts. Clark assented, and Frazer left the interview to request medical treatment for Clark. During Frazer's brief absence, Clark continued to volunteer information to Doran about Clark's involvement in Foster's case.

When Frazer returned, he resumed questioning Clark. Toward the end of the interview, Frazer told Clark about evidence that contradicted or undermined Clark's account of the case. Clark then stated, "Let me do this here. Let me get dried out. Call ya'll back. 'Cause I ain't feeling it." After some brief conversation, Clark restated his desire to "get dried out." Soon thereafter, the interview ended with Doran stating that Clark would have to contact the officers if he wanted to talk to them again because the officers could not initiate any further conversations. After the officers left the room, Clark yawned and lay down on the floor. When Frazer returned to the room a few minutes later and asked what Clark was doing, Clark said that he was "stretching out" and that his symptoms were worse than they were before. At Frazer's request, Clark stood up off the floor and seated himself in a wheelchair. Frazer assured Clark that a nurse would be available shortly, and he wheeled Clark out of the interview room.

Clark testified at the pretrial hearing that on July 26, he was vomiting "every-where" as a result of drug withdrawal, and that he asked to be brought back to his cell after the arraignment hearing. He said he did not ask to, nor did he want to, speak to the officers a second time that day. He said that he only waived his right to remain silent during the second interview in order to speak with Doran about their earlier conversation in Clark's cell.

*Events Leading up to August 3 Interview*

Frazer testified that the following day, July 27, he received voicemail messages from LEC staff indicating that Clark wished to speak with him and Doran. Frazer contacted Balck, who told him that Clark's lawyer needed to be contacted before any interviews. Balck instructed Frazer to inform Clark that (1) the state was having trouble reaching Clark's lawyer, Tom Handley; and (2) Clark should try telephoning Handley. Frazer testified that Balck told him the officers were not to interview Clark again until Handley received notice and called Frazer back. Frazer then visited Clark at the LEC, conveyed the above information, and confirmed that Clark had Handley's phone number. During this meeting, Clark asked Frazer if Frazer could "tell [him] something off the record." Frazer declined to speak about the investigation and told Clark that he needed to contact his lawyer before he and the police could communicate.

In the meantime, the public defender's office had decided to reassign Clark's case from Handley to another lawyer. Connie Iversen, a supervisor charged with reassigning Clark's case, testified that she learned late in the day on July 27 that Balck had telephoned to say that Clark wanted to speak with the police. Iversen had not yet reassigned the case when she learned of Balck's call. Because Iversen knew that the LEC would close for dinner

service at 4 p.m., she went to the LEC to speak with Clark rather than sending another lawyer. Iversen said that she met with Clark for at least an hour and that when she left the meeting, Clark did not want to talk to the police. Iversen said that she left a message for Balck later in the evening on July 27, conveying Clark's position.

Frazer testified that on Thursday, July 28, he again received notice that Clark wished to speak with him and Doran. Frazer then contacted Balck, who told him that Balck and Iversen had set a time for the officers to interview Clark. Later that day—apparently at the time Balck and Iversen had set—Frazer and Doran arrived at the LEC. Frazer said that he never reached the room where Clark was waiting because Iversen "confronted" him in a lobby area near that room and told him that Clark would not be speaking with the officers that day. Frazer said that when he insisted on hearing that information directly from Clark, Iversen stepped in front of him, "basically bump[ed] into [him]," and told him that he could not go near her client. Frazer stated that the confrontation with Iversen continued in the same manner for a few minutes and did not end until he told Iversen that her conduct was unprofessional and walked away.

Iversen gave a substantially different account of the incident with Frazer and the events leading up to that incident. Iversen said that she received a message from Balck late in the day on July 28, stating that Clark had again contacted the police in an effort to speak with them. Iversen said that she was told that Frazer planned to interview Clark at 6 p.m. that day. On receiving this information, she immediately went to the LEC to speak with Clark. Iversen found the LEC closed for dinner service, and while she waited for it to reopen, she went next door to the police station to tell Frazer that she would soon be meeting with Clark and that in all likelihood, Clark would not agree to talk to Frazer. Iversen said that she was unable to meet with Frazer, but a staff person at the police station telephoned Frazer on her behalf. After the telephone call ended, the staff person told Iversen that Frazer did not want to speak to her and that "he was going to come down and talk to [Clark] regardless." Iversen then told the staff person to give Frazer a message that he could meet with Clark in her presence on the following morning, Friday July 29.

Iversen testified that she next returned to the LEC, where she was admitted to speak with Clark at 5:30 p.m. She said that after she met with Clark, she encountered Frazer in an LEC hallway area and told him that Clark did not want to speak with him. She stated that Frazer was rude, angry, and loud, and that he invaded her "personal space." She also said that Frazer asked her about the meeting she had suggested for Friday, July 29. Iversen then told Frazer that she did not think that meeting would happen because Clark had just told her that he no longer wanted to talk to the police based on her advice. Iversen said that after this conversation with Frazer, she either spoke with Balck or left him a message to convey that Clark did not want to speak to the police. The following day, Iversen assigned Clark's case to Richard Sarette and Iversen had no further involvement in the case.

Frazer testified that on August 2, he heard from LEC staff that Clark wanted to speak with him and Doran. Frazer then contacted Balck and told him that the officers wanted to schedule a time through the public defender's office to interview Clark. Frazer told the court that during the

whole day, on [August 2], [he and Balck] were in contact maybe two or three times, and [Balck] was basically [saying] "I'm still trying to get this message through, we want to do this right, we're going to take the high road on this, I'll let you know," and that kind of progressed to the end of the day, on [August 2], and [Frazer] had not heard a definitive answer. But Mr. Balck relayed that Miss Iversen was very frustrated with her client wanting to continue to talk even after her advice, and that ultimately boiled over into a phone call when, [Frazer] believe[d], Mr. Balck was on his off time, away from the office, and he called [Frazer] and said, "Well, we've waited this long, we're just going to have to wait until we get this thing ironed out. It isn't going to happen today," meaning [August 2], and it didn't.

Meanwhile, Frazer continued to receive calls through August 3 that Clark wanted to speak with the police. Frazer said he again contacted Balck, who stated that he would be in contact again with the public defender's office and that he would be setting up a * * * definitive time when we would have this interview, because it was getting to the point where he was having a hard time getting an answer out of the public defender's office, and he basically told [Frazer] that he was going to pick a time and say we would be there, and their lawyer * * * could either be there or not at their choice.

Frazer said that he later heard back from Balck that "a notification had been made to the public defender's office and that they were aware of the [9 p.m. interview] time," and that regardless of whether Clark's lawyer was present, Frazer should proceed with the interview.

It is not clear from Balck's testimony whether he made any efforts to contact the public defender's office on August 2. He said that shortly after 8:40 p.m. on August 3, he left a voicemail message for Iversen or Handley at the public defender's office, indicating that Clark had requested to speak to the police and that "there would be contact with the police as a result of the defendant's contact." Balck said he also left a message with the after-hours answering service for the public defender's office and that LuNhia Yang, an on-call lawyer, subsequently contacted him at home. Balck testified that he received Yang's call at approximately 10:40 p.m., but Yang told the court that she talked to Balck sometime before sending an e-mail message to Iversen at 9:56 p.m. Balck said that he gave Yang the same information he had left in the voicemail message for Iversen or Handley. Balck testified that although he was unable to reach Iversen or Handley directly, he did not instruct Frazer to wait to interview Clark on August 3. He could not remember whether either Handley or Iversen ever told him that Clark did not wish to speak to police.

*August 3 Interview*

Starting at approximately 9 p.m. on August 3, Frazer and Doran conducted their third interview with Clark. The interview lasted approximately two hours and Clark's lawyer was not present. Frazer read Clark his *Miranda* rights at the beginning of the interview and obtained a signed waiver form. Shortly thereafter, the following exchange occurred:

Frazer: Okay. Just so we're clear * * * I got a call from the Ramsey County [d]eputies that said you would like to talk to [Doran] and [me] again about the case. Is that true?

Clark: Yeah.

Frazer: And you know you have a lawyer assigned to this case for you, right?

Clark: Yeah, yeah.

Frazer: And you know that you can have him or her with you if you wanted them, right?

Clark: Yeah.

Frazer: And you've chosen to talk to us without them being here, right?

Clark: Yeah.

Frazer testified that Clark appeared to have "completely moved beyond the withdrawal symptoms" he complained of in the earlier interviews and that he appeared to be free of drugs and alcohol.

Clark's testimony about the third interview differed from that given by the police officers. Specifically, Clark denied making a request to speak to the officers about the case in the days leading up to August 3. He also testified that he had smuggled heroin into the LEC and that he was high during the August 3 interview.

Based on the testimony above, the district court denied Clark's motion to suppress the statements he made during the July 26 and August 3 interviews.

### State's Motion to Admit Clark's Prior Conviction

Before Clark's trial started, the state notified Clark of its intent to introduce several past convictions for impeachment purposes if Clark chose to testify. Shortly before the state rested its case in chief, the state moved the district court to admit only one of these convictions, but for substantive purposes—specifically, to prove Clark's intent with respect to the alleged rape of B.B. After hearing argument on the state's motion, the district court agreed to allow the reading of a transcript in which Clark pleaded guilty in 1994 to attempted first-degree criminal sexual conduct.

### Conviction and Appeal

The jury found Clark guilty of all eight counts of murder and attempted murder. The district court convicted Clark of all counts except the lesser-included offenses of second-degree intentional murder and attempted second-degree intentional murder, which counts the court dismissed. The court then sentenced Clark to life imprisonment without the possibility of parole.[5] On this appeal, Clark argues that the district court erred on three grounds when it refused to suppress the statements he made to the police during the two July 26 interviews and the August 3 interview. Specifically, Clark asserts that the statements should have been suppressed because (1) his heroin withdrawal symptoms prevented him from voluntarily waiving his right to silence during the two July 26 interviews; (2) his statements in all three interviews were the product of coercion or otherwise improper interrogation techniques by the police; and (3) the state violated Clark's Sixth Amendment rights and Minn. R. Prof. Conduct 4.2 by conducting post-arraignment interviews with Clark outside the presence of his lawyer. Clark also argues that the court abused its discretion when it admitted his 1994 conviction for substantive purposes.

### I.

■■■ We first address Clark's argument that the district court erred when it concluded that he voluntarily waived his right to remain silent during the two July 26 interviews. The Fifth Amendment to the U.S. Constitution, made applicable to the states by the Fourteenth Amendment, prohibits the government from compelling a person to testify against himself. *State v. Scott*, 584 N.W.2d 412, 417 (Minn.1998).

---

**5.** Life imprisonment without the possibility of parole is the mandatory sentence for a conviction of first-degree murder in the course of kidnapping. Minn.Stat. § 609.106, subd. 2(2) (2006).

A person may waive his Fifth Amendment right to remain silent, but such a waiver must be knowingly, intelligently, and voluntarily given. *Id.* (citing, among other decisions, *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). When deciding whether a defendant voluntarily waived his right to remain silent, courts consider the totality of the circumstances based on factors such as the defendant's age, maturity, intelligence, education, experience, and ability to comprehend. *State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978). Other relevant factors include, among others, the lack of or adequacy of warnings, the length and legality of the detention, the nature of the interrogation, any physical deprivations, and limits on access to counsel and friends. *Id.*

■ Findings of fact surrounding a purported *Miranda* waiver are reviewed for clear error, and legal conclusions based on those facts are reviewed de novo to determine whether the state has proven by a preponderance of the evidence that the defendant waived his *Miranda* rights voluntarily. *State v. Burrell*, 697 N.W.2d 579, 591 (Minn.2005). Here, the district court made a number of detailed factual findings that correspond to the *Linder* factors. The court found that Clark is 33 years old and sufficiently intelligent "to comprehend questions asked of him, including legal terminology," and that Clark is a "mature individual with a lot of 'street smarts,' " whose extensive experience with the criminal justice system began in adolescence and included three prior felonies. The court also found that Clark received adequate *Miranda* warnings at the beginning of each interview and acknowledged that he understood his rights, and that Clark initiated the second July 26 interview. Finally, the court found that (1)

Clark "did not appear to be in physical distress" during the interviews; (2) Clark "demonstrated a clear understanding of the questions"; (3) Clark "appeared willing to talk for hours"; and (4) Clark's "own attorneys never believed that [he] was unable to track and understand what was going on" and never requested a psychological evaluation for possible mental illness.

Our review of the recorded interviews provides strong support for the district court's findings, including those concerning Clark's physical condition. Clark's interaction with the officers at the beginning of each interview shows that he understood the *Miranda* rights he was waiving, and we see no evidence to substantiate Clark's assertion that his heroin withdrawal symptoms interfered in any substantive way with his cognition or volition. Further, while Clark complained about these symptoms during both July 26 interviews and sometimes placed his head on the table during the second interview, he was consistently responsive and coherent.

The district court's factual findings—which we cannot deem clearly erroneous on the record before us—support a conclusion that under our case law, Clark voluntarily waived his *Miranda* rights. Apposite cases include *State v. Williams*, 535 N.W.2d 277, 288 (Minn.1995), in which we identified as relevant the defendant's extensive criminal background and concomitant experience in the criminal justice system; and *State v. Blom*, 682 N.W.2d 578, 615 (Minn.2004), in which we noted that although the defendant was on prescription drugs, there was no evidence that he was materially impaired when he "spoke in a normal tone of voice, freely and voluntarily gave answers to questions, and was alert, lucid, cooperative, and calm." [6] In

---

**6.** The cited part of each of these cases addresses the issue of whether a confession, not

light of these and other cases, we hold that the district court did not err when it concluded that Clark voluntarily waived his right to remain silent during the two July 26 interviews.

## II.

■ We next address Clark's argument that the district court erred when it refused to suppress the statements he made to police during the three interviews because these statements were the involuntary product of coercion or otherwise improper interrogation techniques by the police. When deciding whether a defendant's statement is involuntary, courts inquire whether police conduct, "together with other circumstances surrounding the interrogation, [was] so coercive, so manipulative, [and] so overpowering [as to] deprive[ ] [a defendant] of his ability to make an unconstrained and wholly autonomous decision to speak as he did." *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn.1991). This totality-of-the-circumstances inquiry "significantly overlaps" the approach courts use in determining whether a defendant voluntarily waived his *Miranda* rights. *Williams*, 535 N.W.2d at 287. Courts look with disfavor on implied and express promises made by the police during interrogation, but such promises do not automatically render a statement involuntary. *State v. Ritt*, 599 N.W.2d 802, 808 (Minn.1999).

■ We review a district court's conclusion as to the voluntariness of a statement de novo to determine whether the state proved voluntariness based on the totality of the circumstances. Id. at 808. We make this determination based on all factual findings that are not clearly erroneous. Id. Here, the court made several detailed factual findings relevant to decid-

ing whether Clark's confession was voluntary. For example, the court found that Clark initiated two of the interviews, *see Blom*, 682 N.W.2d at 615 (noting that the defendant initiated the interview); that Clark was not held in poor conditions and was provided with cigarettes, *see Ritt*, 599 N.W.2d at 810 (noting that defendant "was allowed to smoke freely" during interview); and that the officers kept the interviews low-key and fairly short, *see State v. Thaggard*, 527 N.W.2d 804, 812 (Minn.1995) (noting that interview was relatively short).

The district court also found that Clark was not subjected to threats or trickery and that the police did not "employ any improper, coercive atmosphere while interviewing [Clark]." But we note that Frazer and Doran made several comments during the July 26 and August 3 interviews that could arguably be characterized as implied or express promises. For example, Doran told Clark at the beginning of the first interview on July 26 that

> today's the luckiest day you got going for ya. And do you know why? 'Cause today you're gonna set yourself free. All this shit that's happened to you in the past up 'til now—is done. It's over. From this day forward Courtney—look me in the eye—*from this day forward your future's spotless.* You can never fuck up again if you don't want to. Okay? So what I'm telling you—man to man, today, nothing else will matter. We're gonna get all those fuckin' demons and all that shit off your back. Okay? You're gonna be real with me like you have in the past, and we're gonna deal with this today. Okay?

(emphasis added). Moments later, immediately after Clark signed a *Miranda* waiver form, Doran told Clark,

---

a *Miranda* waiver, is voluntary. But courts use a totality of the circumstances analysis,

based on the *Linder* factors, to decide both of these issues. *Williams*, 535 N.W.2d at 287.

Courtney, I wish I had two days to talk to you. We'll do as much as we can now. I want you to dig down deep and let's get every fuckin' demon off your back. Okay? Like I said, no longer are we going to live like this anymore. The old Courtney Clark is dead. As of right now—today—your future is spotless. You've got nothing wrong in your future. If you talk to your God and find it in your soul right now let's get all those fuckin' demons off your back. Man to man, okay? I want you to tell me what the fuck happened.

During the second July 26 interview, Doran and Frazer encouraged Clark several times to "get the demons off" his back, but neither officer alluded to Doran's comment in the first interview that Clark's future would be "spotless" if he told them the truth.

At the beginning of the August 3 interview, Doran and Clark had the following exchange:

Doran: Tonight's the night it's all cleared up. From this day forward we're done with this, okay? I don't want to keep coming back here and talking[;] we're gonna get this shit done tonight. And then we're gonna carry on with our lives. Like I said before C, your future is spotless—starting today, your future is spotless.

Clark: Compared to what?

Doran: C, ya can't screw up anymore. Today's a good day. Today is a good day. And I think tonight after your conversation you're gonna set your soul free, you're gonna tell me exactly what happened in your own words * * * okay?

Clark: [shaking head yes]

Doran: That's what's gonna happen tonight and I feel that, I feel good about it, otherwise I wouldn't have come here * * *.

Later in that interview, Frazer and Doran indicated to Clark that while a conviction for first-degree premeditated murder would necessarily result in a sentence of life imprisonment without the possibility of parole, "something other than a preplanned * * * murder of Foster—and rape of [B.B.]" might result in Clark "getting out [of prison] sometime." Shortly thereafter, Clark asked if he could speak to Doran alone for 5 minutes. Frazer left the interview room, and Doran said:

I know what happened. I think you got so whacked out, you lost your head. You didn't plan this, you didn't plan to kill—* * * But because you were high and you were whacked out, you lost your head. You didn't plan this. C, you didn't plan this, but it ended up that way.

Clark then said, "That's right," to which Doran responded,

This is a life—this is a life sentence. Now if you want to tell the real deal—tell the real deal—what happened and cooperate and do the right thing and not tell lies—there might be a break in this. They might not give you life without parole.

In the exchange that followed, Doran told Clark that premeditated versus accidental killing was "the difference between [Clark] spending the rest of [his] life in prison with no parole" and "serving your time * * * and then having some form of life after prison." Moments later, Doran again told Clark that if Clark told the truth, his future would be "spotless." Clark then asked Doran, "What you gonna do for me?" Doran said he would do whatever he could and would tell "them" that Clark was being honest and had not premeditated Foster's murder. Clark then proceeded to give Doran an account that was largely consistent with the testi-

mony he ultimately gave at trial. Clark repeated this account when Frazer returned to the room.

Clark has a colorable argument that the officer's comments with respect to the "spotless" future that would await him were improper because they were potentially misleading. But a careful review of the recorded interviews and transcripts reveals that Clark did not interpret the officers' spotless future comments as promises of lenient treatment. *See Thaggard*, 527 N.W.2d at 811–12 (describing as "key" the fact that an implied promise of lenient treatment did not lead the defendant to believe that he would avoid prosecution if he confessed). For example, after one of these comments, Clark asked perceptively, "Compared to what?" Doran responded by repeating his earlier statement that Clark could "set [his] *soul* free" (emphasis added). In the context of the interviews as a whole, the officer's "spotless" future and related comments are most properly characterized as appeals to Clark's conscience and personal integrity—not as implied promises for lenient treatment in exchange for a confession.

As to the officers' suggestions that Clark could avoid receiving a sentence of life imprisonment without parole if he confessed to accidentally killing Foster, it is important to distinguish between comments identifying the potential sentences imposed for different degrees of murder and express promises that a defendant will be charged with a lesser offense in exchange for his confession. *See State v. Slowinski*, 450 N.W.2d 107, 112 (Minn. 1990). In *Slowinski*, the defendant argued that police used coercive methods to obtain his confession when they (1) "implied that by confessing, [the] defendant might be charged with a lesser crime"; and (2) "suggested they had influence with the county attorney" regarding the crimes to

be charged. *Id.* at 111–12. In evaluating Slowinski's argument, we stated that it would not be "improper for police officers to inform a defendant of the various degrees of murder," but it *would* be improper for the police to suggest that they had influence with the county attorney to argue for lenient treatment. *Id.* at 112. We nonetheless concluded that improper suggestions of influence with the county attorney "were not the kind of statements that would make an innocent man confess." *Id.*

Here, neither Frazer nor Doran promised Clark that he would be charged with a less serious offense if he admitted to accidentally killing Foster; rather, the officers indicated that if Clark cooperated and told the truth, "there *might* be a break" and Clark "*might not* [receive] life without parole" (emphasis added). Further, while Doran told Clark that Doran would do whatever he could and would tell "them" that Clark was being honest, this statement does not convey any assurance that the officers could substantially influence the disposition of Clark's case. *See State v. Beckman*, 354 N.W.2d 432, 437 (Minn. 1984) (upholding the admission of a confession despite interrogator's comment that defendant's cooperation would be brought to the district court's attention). For the foregoing reasons, we conclude that Frazer's and Doran's comments—while troubling in some respects—cannot reasonably be construed as comments that would make an innocent man confess.

We also conclude that contrary to Clark's contention, the officers did not make improper threats against Clark in an effort to obtain his statement. Near the end of the first July 26 interview, Frazer told Clark that "if you don't talk again, * * * we're gonna have to proceed ahead with what other people have said about you * * * and I don't think you want that to happen." At other points during the

interviews, Frazer attempted to persuade Clark to talk by describing inculpatory evidence that had already emerged or could reasonably emerge in the officers' investigation. But Clark does not argue that Frazer misrepresented the emerging evidence in the case, and we have held that it is not improper for interrogators to inform a defendant of the evidence marshaled against him. *See, e.g., Pilcher,* 472 N.W.2d at 334.

Notwithstanding the case law discussed above, Clark contends that the combined effect of the officers' interrogative techniques and his heroin withdrawal symptoms compels a conclusion that his July 26 statements were not voluntary.[7] In support of this contention, Clark points to indications in the record that he was suffering flu-like symptoms, including sweating and nausea. Clark also points to his testimony that he vomited before the interviews. Accepting these facts as true, we still cannot conclude that Clark's physical discomfort—even when combined with allegedly improper comments by the police—deprived him of his ability to make an unconstrained and wholly autonomous decision to speak as he did. To the contrary, rather than succumbing to the officers' interrogative techniques, Clark insisted throughout both July 26 interviews that he had no involvement in Foster's murder. The fact that Clark adhered to a fabricated account of Foster's death also shows that his will was not overborne. *See id.; Ritt,*

599 N.W.2d at 810 (noting that while the interrogation "may have been unpleasant" for the defendant, "there [was] little indication that her will was overborne" in light of her continued denial of possessing the criminal intent that was eventually proved at trial).

For all of the foregoing reasons, we hold that the district court did not err when it concluded that Clark's statements during the two July 26 interviews and the August 3 interview were voluntary and therefore admissible.[8]

## III.

We now turn to Clark's claims regarding violations of his Sixth Amendment right to counsel and Minn. R. Prof. Conduct 4.2 with respect to the second July 26 interview and the August 3 interview (post-arraignment interviews). In his brief, Clark characterized these claims as related, if not overlapping. Specifically, he asserted that "part of" an accused person's right to counsel "is based on" Rule 4.2. But at oral argument, Clark conceded that a Sixth Amendment claim is analytically distinct from a Rule 4.2 claim and that each is governed by a different body of law. Having made this distinction, Clark focused his argument on the state's alleged violation of Rule 4.2. It is not clear whether Clark's comments at oral argument constituted an implicit withdrawal of his Sixth Amendment claim. Accordingly, we first

---

7. The record suggests—and Clark does not appear to dispute—that the withdrawal symptoms were present on July 26 but not August 3. Clark testified at the *Rasmussen* hearing that he was high on August 3 on heroin he smuggled into the LEC. But Clark has not argued that this testimony should be considered in determining whether he voluntarily confessed that day.

8. Clark argues in the alternative that if the district court properly admitted the July 26 statements, it nonetheless erred under *State v.*

*Anderson,* 247 Minn. 469, 78 N.W.2d 320 (1956) by failing to give a cautionary instruction as to the weight of the statements in light of Clark's withdrawal symptoms. But Clark never requested such an instruction. Consequently, he is not entitled to relief unless he establishes that the district court's error satisfies the elements of the plain error doctrine. *See, e.g., State v. Goodloe,* 718 N.W.2d 413, 422 (Minn.2006). Clark did not attempt to establish plain error on appeal.

address whether the state violated Clark's Sixth Amendment right to counsel, and second, whether the state violated Rule 4.2.

### Sixth Amendment Right to Counsel

The Sixth Amendment to the U.S. Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to * * * have the assistance of counsel for his defence." U.S. Const. amend. VI. This right attaches as soon as the accused person is subject to adverse judicial proceedings, including arraignments. *See, e.g., United States v. Gouveia,* 467 U.S. 180, 187–88, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984). An accused person can waive his Sixth Amendment right to counsel, but the government bears the burden of proving that the person "understood that he had a right to have counsel present during an interrogation and that he intentionally relinquished or abandoned that known right." *Giddings v. State,* 290 N.W.2d 595, 597 (Minn.1980) (citing *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)); *see also State v. Kivimaki,* 345 N.W.2d 759, 763 (Minn.1984) (adopting the Eighth Circuit's conclusion that the validity of a waiver of the right to counsel under either the Sixth or Fifth Amendment "is judged by essentially the same standard"). In deciding whether the government has met its burden, courts consider the circumstances of each case, including the age, experience, and background of the defendant. *Giddings,* 290 N.W.2d at 597.

In this case, the district court concluded that the state met its burden of proving that Clark "voluntarily, knowingly, and intelligently abandoned or relinquished" his known right to counsel during his post-arraignment interviews. This conclusion is supported by the court's factual findings regarding (1) Clark's age, experience, and background; and (2) the adequacy of the *Miranda* warning that police gave to Clark at the second July 26 interview, which warning explicitly addressed Clark's right to have a lawyer present. As previously stated, these findings are not clearly erroneous on the record before us. Moreover, with respect to the August 3 interview, the transcript indicates that shortly after Frazer gave Clark a *Miranda* warning, the following exchange occurred:

> Frazer: [Y]ou know you have a lawyer assigned to this case for you, right?
>
> Clark: Yeah, yeah.
>
> Frazer: And you know that you can have him or her here with you if you wanted them, right?
>
> Clark: Yeah.
>
> Frazer: And you've chosen to talk to us without them being here, right?
>
> Clark: Yeah.

For the foregoing reasons, we hold that the district court did not err when it concluded that the state did not violate Clark's Sixth Amendment right to counsel by conducting the post-arraignment interviews.

### Minnesota Rule of Professional Conduct 4.2

Minnesota Rule of Professional Conduct 4.2 provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

"[O]ur case law clearly establishes that [Rule] 4.2 applies to prosecutors involved in custodial interviews of a charged suspect." *State v. Miller,* 600 N.W.2d 457, 464 (Minn.1999). Moreover, police contact with a suspect may be at-

tributed to a prosecutor when the prosecutor orders or ratifies the police contact, as apparently happened in this case. *Id.* The purpose of Rule 4.2 is to protect the represented individual "from the supposed imbalance of legal skill and acumen between the lawyer and the party litigant." *Id.* at 463 (quotation marks omitted).

In this case, the district court admitted Clark's statements from the post-arraignment interviews after finding that Clark's lawyer had *notice* of the interviews and an opportunity to be present. Clark essentially argues that the district court misconstrued what Rule 4.2 requires, and that the state violated the rule by failing to obtain his lawyer's *consent* before conducting the interviews. The state argues that the court properly construed and applied Rule 4.2, and further, that suppression of Clark's statements would be unwarranted even if the state did violate the rule. In light of these arguments, we first consider what steps the state must take when Rule 4.2 applies before interviewing a represented criminal defendant outside the presence of the defendant's lawyer. We then decide whether the state took those steps here, and if not, whether the state's violation of Rule 4.2 warrants suppression of Clark's statements.

*Rule 4.2 Requirements*

 Precisely what Rule 4.2 requires of the state in the context of a criminal case is a question of law we review de novo. *See Lennartson v. Anoka–Hennepin Indep. Sch. Dist. No. 11,* 662 N.W.2d 125, 129 (Minn.2003). In *Miller,* we described the scope of Rule 4.2 as follows:

> [Rule] 4.2 protects the right of counsel *to be present* during any communication between the counsel's client and opposing counsel. The focus of [Rule] 4.2 is on the obligation of attorneys to respect the relationship of the adverse party and

the party's attorney. * * * [T]he party cannot waive the application of [Rule 4.2]—*only the party's attorney can approve the direct contact and only the party's attorney can waive the attorney's right to be present* during a communication between the attorney's client and opposing counsel.

600 N.W.2d at 464 (citing *United States v. Lopez,* 4 F.3d 1455, 1462 (9th Cir.1993)) (emphasis added). Based on the passage above and the plain language of Rule 4.2, we agree with Clark that a lawyer representing a criminal defendant is owed more than notice and an opportunity to be present before the state interviews the defendant about the subject of the representation. We also agree that the operative word in Rule 4.2 is "consent."

The more difficult question is precisely what the defendant's lawyer must consent *to* before the state may permissibly communicate with the defendant. Our language in *Miller* could support an interpretation of Rule 4.2 requiring the state to obtain the lawyer's consent before communicating with the defendant *outside the lawyer's presence.* Under this interpretation, the state could interview a defendant who insists on speaking to the police over his lawyer's objection, as long as the lawyer is present during the interview. This interpretation denies the defense lawyer "veto power" over a defendant's decision to speak with the police, while arguably helping to achieve the Rule's purpose—protecting the defendant from being "taken advantage of." *See Miller,* 600 N.W.2d at 463 (quotation marks omitted).

An alternative interpretation of Rule 4.2 is that the state must obtain consent from the defendant's lawyer before engaging in *any* communication with the defendant, even when the defendant has requested contact with the police after being counseled against such contact and the defen-

dant's lawyer is present. This interpretation is troubling in that it substantially infringes on a defendant's autonomy in favor of his lawyer's beliefs as to the defendant's best interests. *See* Carl A. Pierce, *Variations on a Basic Theme: Revisiting the ABA's Revision of Model Rule 4.2 (Part III)*, 70 Tenn. L.Rev. 643, 648 (2003) ("[T]he no-contact rule * * * is simply too paternalistic and does not accord sufficient respect for the client's autonomy or the client's freedom to speak without the prior consent of [his] lawyer."); John Leubsdorf, *Communicating with Another Lawyer's Client: The Lawyer's Veto and the Client's Interests*, 127 U. Pa. L.Rev. 683, 689 (1979) ("A legal system valuing informed personal choice should not assume that a client aided by his lawyer cannot make a sound decision whether to communicate with opposing counsel."). Such an infringement on personal autonomy is arguably unnecessary in the criminal law context, given the protections that the Constitution and case law provide to criminal defendants against government overreaching. As previously stated, these protections are entirely independent of Rule 4.2.[9]

▇▇▇ Notwithstanding the concerns set forth above, we conclude that when a government attorney is involved in a mat-

ter such that Minn. R. Prof. Conduct 4.2 applies, the state may not have *any* communication with a represented criminal defendant about the subject of the representation unless (1) the state first obtains the lawyer's consent; (2) the communication is "authorized by law" as discussed below; or (3) the state obtains a court order authorizing the communication. We reach our conclusion on the plain and unambiguous language of the rule as currently written.[10] Accordingly, to the extent that any of our past cases suggest that the state can meet the requirements of Rule 4.2 by providing the defendant's lawyer notice and an opportunity to be present, those cases are no longer good law.

*Whether the State Violated Rule 4.2*

▇▇▇ With the foregoing principles in mind, we must now decide whether the state violated Rule 4.2 when officers Frazer and Doran conducted the post-arraignment interviews with Clark. There was no court order authorizing the interviews; accordingly, the state must establish either that Clark's lawyer consented to the interviews or that the interviews were authorized by law. The record contains no evidence that Clark's lawyer consented to the August 3 interview between Clark and the

---

**9.** We note that in an apparent effort to balance personal autonomy, protection of personal interests, and public safety considerations, at least one state has adopted a version of the no-contact rule that exempts under certain circumstances communication between represented persons and government lawyers engaged in civil or criminal law enforcement. Under Utah R. Prof. Conduct 4.2(c)(4), such communication is exempt if the represented person initiates the communication and "if prior to the communication the represented person has given a written or recorded voluntary and informed waiver of counsel, including the right to have substitute counsel, for that

communication." *See also* Pierce, *supra*, at 707.

**10.** We recognize that one undesirable consequence of our interpretation of Rule 4.2 may be that the police—in order to avoid a potential obstacle to admissibility of a statement under the Rule—will be less likely to obtain legal advice before proceeding to interview a represented defendant who has expressed the desire to speak with them. In light of this possible consequence and the other concerns we have articulated in this opinion, we invite a review by the appropriate committee(s) of Rule 4.2 as it relates to government lawyers' contact with represented criminal defendants.

police. But the record is more ambiguous with respect to the second July 26 interview in light of testimony from Balck and Handley, as well as Clark's indication to Frazer and Doran that he had spoken to Handley and Handley was "pissed off." While this evidence could support an argument that Handley gave tacit consent for the interview, we conclude that tacit consent—even to the extent it existed here—is not sufficient to meet the requirements of Rule 4.2.

We also conclude that the post-arraignment interviews of Clark were not communications "authorized by law" for the purposes of Rule 4.2. The comments following Rule 4.2 provide examples of communications authorized by law, including

> communications by a lawyer on behalf of a client who is exercising a constitutional or other legal right to communicate with the government. Communications authorized by law may also include investigative activities of lawyers representing governmental entities, directly or through investigative agents, *prior to the commencement of criminal or civil enforcement proceedings.*

Minn. R. Prof. Conduct 4.2 cmt. 5 (emphasis added). There is no dispute in this case that the second July 26 interview and the August 3 interview took place after criminal proceedings were commenced against Clark. Further, we do not conclude that Clark was "exercising a constitutional or other legal right" when he communicated with the police during these interviews. Finally, we discern no other basis on which to conclude that the interviews in this case were authorized by law.

For all of the foregoing reasons, we conclude that the state violated Rule 4.2 by conducting the post-arraignment interviews with Clark.

*Whether Suppression is Warranted*

Having concluded that the state violated Rule 4.2, we must determine whether the sanction that Clark seeks in this appeal—that is, suppression of the post-arraignment interview statements—is warranted. As a preliminary matter, we note that Rule 4.2 is a rule of professional conduct, not a constitutional or statutory provision. "The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies." Minn. R. Prof. Conduct, Scope cmt. 20. Accordingly, a rule violation is "a basis for invoking the disciplinary process," *id.* cmt. 19, and "does not necessarily warrant any * * * nondisciplinary remedy," *Id.* cmt. 20.

Based on analogous principles underlying their own rules of professional conduct, "nearly every court that has ruled on [a no-contact rule violation in a criminal law context] has found that suppression of a [statement] is an inappropriate remedy for a lawyer's ethical violation." *State v. McCarthy,* 819 A.2d 335, 341 (Me.2003) (footnote omitted); *see, e.g., State v. Johnson,* 318 N.W.2d 417, 437 (Iowa 1982) (concluding that suppression of a defendant's statements is not an appropriate remedy for the government's violation of the no-contact rule); *State v. Morgan,* 231 Kan. 472, 646 P.2d 1064, 1070 (1982) (same); *People v. Green,* 405 Mich. 273, 274 N.W.2d 448, 454–55 (1979) (same); *State v. Decker,* 138 N.H. 432, 641 A.2d 226, 229–30 (1994) (same); *see also State v. Ford,* 793 P.2d 397, 399–400 (Utah Ct.App.1990) (holding that the government's violation of the no-contact rule is not an independent basis for reversing a defendant's conviction).

Unlike these jurisdictions, we have not adopted a per se rule placing suppression of defendant's statements outside the ambit of possible sanctions for a violation of

Rule 4.2. Rather, we have taken a case-by-case approach to determining whether the state's conduct is so egregious as to compromise the fair administration of justice. *See State v. Ford,* 539 N.W.2d 214, 224–25 (Minn.1995). In cases where the state's conduct is sufficiently egregious, we may determine that suppression is warranted.

One such case is *State v. Lefthand,* 488 N.W.2d 799 (Minn.1992). We had not yet articulated the egregiousness standard when we decided *Lefthand,* a case that references Rule 4.2 indirectly in the broader context of constitutional protections against self-incrimination. Id. at 801 n. 6 Nonetheless, we concluded that suppression of Lefthand's inculpatory statement was warranted regardless of his apparent waiver of constitutional protections given the circumstances under which the police obtained the statement.[11] *Id.* at 801–02; *see also Ford,* 539 N.W.2d at 224 (noting that Lefthand was advised of and waived his constitutional rights). Specifically, the police interviewed Lefthand with permission from the prosecutor assigned to the case but without notification to the defendant's lawyer. *Lefthand,* 488 N.W.2d at 800. At the time of the interview, Lefthand, who had made his first court appearance in connection with two alleged homicides, was in custody pending a court-ordered Rule 20 mental competency examination. *Id.* We did not indicate in *Lefthand* how the interview came to occur, but we noted in a subsequent case that Left-

hand initiated contact with the police. *Ford,* 539 N.W.2d at 224.

In *Ford,* we addressed an alleged violation of Rule 4.2 under somewhat different circumstances and ultimately concluded that suppression of the defendant's statements was not warranted. *Id.* at 225. The police in *Ford* conducted two custodial interviews with a represented defendant who requested to speak with the police. *Id.* at 223. The defendant initiated the first contact by stating that he had to speak with the police "right away" about "a matter of urgency and a life and death situation." *Id.* The police conducted both interviews without notifying either the county attorney or the defendant's lawyer. Id. Without considering whether the police officers' conduct would fall within the ambit of Rule 4.2 absent the county attorney's involvement, we noted that while statements taken in violation of the Rule are *subject to* exclusion,

> *Lefthand* did not create an automatic exclusionary rule for a violation of Rule 4.2, [Minn. R. Prof. Conduct], by a prosecutor. Driving our decision in *Lefthand,* was our belief that *the fair administration of justice had been compromised.* Our determination that the material should be excluded in that case and future similar cases was not based solely on the violation of the [Minn. R. Prof. Conduct], but rather was based on the egregiousness of the government's action in total. \* \* \* The facts in *Lefthand* were egregious. Less egregious

---

11. While we made reference to Rule 4.2 in a footnote in *Lefthand,* we did not base our decision to suppress the inculpatory statement on the state's violation of the Rule. Rather, we cited our inherent supervisory power:

> [I]n the exercise of our supervisory power to insure the fair administration of justice in this and future cases, we decide that in-

custody interrogation of a formally accused person who is represented by counsel should not proceed prior to notification of counsel or the presence of counsel. Statements obtained *without notice to or the presence of counsel* are subject to exclusion at trial.

*Lefthand,* 488 N.W.2d at 801–02 (footnote omitted) (emphasis added).

violations do not require so severe a remedy.

*Id.* at 224–25 (emphasis added).

In *Miller*, we considered the egregiousness of the state's conduct in the context of the "authorized by law" exception to Rule 4.2. 600 N.W.2d at 464–68. *Miller* involved police officers who acted under the direction of assistant county attorneys to execute a search warrant against a business under investigation by local and federal agencies. *Id.* at 460–62. During the execution of the warrant, the defendant—then a suspect—agreed to participate in an interview with police after faxing a copy of the warrant to his lawyer. *Id.* at 461. While the interview was underway, the lawyer contacted the police officer overseeing the warrant execution on site and told the officer he did not want police to take statements from any of the business's employees without the lawyer's presence. *Id.* The officer refused to terminate the interviews and refused to let the lawyer speak to the defendant. *Id.* The lawyer then contacted an assistant county attorney, who ratified the officer's conduct. *Id.* After receiving the assistant county attorney's response to his inquiry, the defendant's lawyer proceeded to the premises where his client was being interviewed and again asserted that he represented the business and its employees. *Id.* The officer did not permit the lawyer to enter the building where the interviews were occurring or permit the lawyer to speak with any of the employees. *Id.* at 461–62. We concluded that in light of these facts, the state's conduct was sufficiently egregious to compromise the administration of justice and to exceed what was "authorized by law." *Id.* at 468. Consequently, we held that the parts of the defendant's statements taken after his lawyer contacted the officer at the site must be suppressed. *Id.*

When we consider the actions of Balck, Frazer, and Doran in the context of the cases discussed above, we conclude that the conduct surrounding the state's violation of Rule 4.2 was not so egregious as to warrant the suppression of the statements Clark made during the post-arraignment interviews. First, we conclude that based on our existing case law, Balck could reasonably have believed that his obligation under Rule 4.2 was to provide Clark's lawyer with notice and an opportunity to be present at the post-arraignment interviews.[12] Further, the record before us does not support a conclusion that the district court clearly erred in finding that Clark's lawyer received such notice and an opportunity to be present at the second July 26 interview. In contrast, the record does support a conclusion that the court clearly erred in finding that Balck provided Clark's lawyer with notice of the August 3 interview *and an opportunity to be*

---

**12.** Based on the record, we do not agree with the dissent's contention that Balck believed he was required only to "attempt to contact" Clark's lawyer before authorizing the police to grant Clark's repeated requests to speak with them. Before Balck gave the particular testimony that the dissent cites in support of this contention, Balck indicated to the court that he made contact with someone in the public defender's office before every meeting other than the one on August 3. Balck testified:

> To the best of my recollection, each time that I was contacted by Sergeant Frazer, I attempted and did contact, or attempted to contact in the case of the evening of August 3, someone from the Public Defender's Office to inform them that [Clark] had made contact [with] the police * * * and wanted to talk to the police.

Moreover, the testimony on which the dissent relies does not establish that Balck authorized the police to speak to Clark "whether the contact was made or not"; rather, the testimony establishes only that Balck regularly kept Frazer abreast of his efforts to contact Clark's lawyer.

*present.* Balck's after-hours voicemail messages left twenty minutes before the August 3 interview do not effectively provide such an opportunity.

Nonetheless, when we consider all the evidence in the record, we do not perceive Balck's actions as evidencing the bad faith or blatant disregard of professional obligations that we have previously associated with the phrase "egregious conduct." Unlike the assistant county attorney in *Miller*, Balck did not authorize the police to deny access to Clark by Clark's lawyer even as that lawyer waited outside the door to the interview room demanding to talk to Clark. To the contrary, according to Frazer, Balck tried to reach Clark's lawyer on August 2 and refused to allow a police interview to occur because Balck was unable to "get [a] message through." We see no basis to discount as unreliable Frazer's sworn testimony that after Balck made several unsuccessful attempts to reach Clark's lawyer on August 2, Balck told Frazer that "we're just going to have to wait until we get this thing ironed out" and "[i]t isn't going to happen today." Moreover, Frazer indicated that Balck expressed his intention that the state "take the high road" with respect to Clark's case. This intention is apparent in Balck's actions on July 27 and August 2, actions which indicate that he tried to meet Rule 4.2's requirements as he understood them.

The dissent theorizes that Balck may have been frustrated because Clark's lawyers were successful in blocking past interviews. We believe that it would be just as valid to speculate that by August 3, Balck had grown frustrated by the combination of Clark's multiple requests to speak to the police despite the advice of his lawyers, the multiple changes in lawyers representing Clark, and what Balck may have perceived to have been a lack of responsiveness by the public defender's office. At a minimum, the record supports a conclusion that there was poor communication between both offices that may have led to frustration on both sides; this frustration may have led to Balck's lapse in judgment when he did not attempt to prevent the 9 p.m. interview on August 3. Thus, while we do not condone Balck's failure to prevent the August 3 interview, we disagree with the dissent's characterization of Balck's actions as a flagrant display of professional misconduct aimed at thwarting Clark's right to the assistance of counsel. Rather, we conclude that in light of all the testimony before the district court, Balck's failure to prevent the August 3 interview to proceed is more appropriately characterized as a lapse of professional judgment under frustrating circumstances.

There is substantial evidence in the record that Clark made repeated efforts to speak with the police—before *and after* consulting with his lawyers—and that Clark, not the state, initiated the post-arraignment interviews. Indeed, Frazer testified that Balck told him "Iversen was very frustrated with her client wanting to continue to talk even after her advice," and Balck told the court that Iversen told him on the morning of August 4 that she was "washing her hands" of Clark—a statement Iversen did not deny under cross-examination.[13] While Clark's repeated initiation of contact with the police does not affect our decision as to whether the state violated Rule 4.2, it does influence our conclusion that the conduct leading to the

---

13. Even though Iverson's comment was made on August 4, the day after the police interviewed Clark, we find her comment to be informative as to the degree of mutual frustra-

tion that surrounded the communications between the county attorney's office and the public defender's office.

violation was not so egregious as to warrant the suppression of Clark's statements.

Finally, we note our basic disagreement with the dissent as to what the record establishes regarding the motivations of the police and Balck in this case. The dissent apparently concludes that there was a conscious and coordinated campaign by the police, assisted by Balck, to undermine Clark's constitutional rights. But we find little evidence to support the dissent's conclusion that "Balck played a role in *assisting* the police to *implement* their strategy to get access to Clark after counsel was appointed" (emphasis added). Rather, we conclude the record establishes that once the police recognized that Clark was represented by a lawyer, they contacted Balck to seek Balck's advice on how to proceed before responding to Clark's repeated requests to talk to them. This is precisely what we should ask the police to do, and we encourage the police to continue working closely with prosecutors to help ensure that a defendant's rights are not violated.

The record further establishes that in response to the officers' inquiries between July 26 and August 2, Balck repeatedly attempted to meet what he reasonably believed to be his professional obligations. More particularly, as previously noted, Balck testified that with the exception of August 3, each time he was contacted by Frazer, he "attempted and did contact" someone from the public defender's office for the purpose of informing the public defender that Clark had made contact with the police.

At bottom, our disagreement with the dissent appears to stem from how we construe the record as a whole. We arrive at different conclusions regarding not only *what* happened between the police, Balck, Clark, and Clark's lawyers—but also *why* the events unfolded as they did. More

particularly and in addition to the examples we have already addressed, we note that in support of its conclusion that "the police adopted a clear strategy to undermine Clark's relationship with his counsel, even before counsel was appointed," the dissent states that Doran said to Clark: " 'I am your attorney. I can prove better than your attorney. Just do what I tell you to do.' " In reaching this conclusion, the dissent notes that the sole basis for this statement attributed to Doran is Clark's "unrebutted" testimony at the *Rasmussen* hearing. While Doran was not specifically questioned during the *Rasmussen* hearing about whether he made such a statement to Clark, we conclude that Doran essentially rebutted Clark's statement when Doran testified that he did not have *any* conversations with Clark at the LEC before the formal pre-arraignment interview he conducted with Frazer.

Moreover, we do not agree with the dissent's conclusion that there was no particular urgency compelling the police to respond to Clark's requests to talk with them. By definition, the existence of an ongoing murder investigation implicates public safety, and the police have a duty to identify and vigorously investigate any clues that could lead to the arrest and incapacitation of persons who may have played a role in the murder. The police could reasonably have believed that Clark wanted to provide actionable information to assist in their investigation, and therefore, they acted with appropriate urgency in attempting to respond to Clark's repeated requests to talk with them. Further, the record reveals that on July 27 and August 2, the police did not respond "immediately" to Clark's request to talk; rather, they delayed interviewing Clark for one or more days to enable Balck to notify Clark's lawyer. Finally, we note that

Clark did give testimony that was consistent with his August 3 statement.

For all of the foregoing reasons, we conclude that the district court did not err when it denied Clark's motion to suppress the statements Clark made to the police during the post-arraignment interviews on July 26 and August 3.

## IV.

 Finally, we consider Clark's claim that the district court abused its discretion when it admitted evidence of Clark's 1994 conviction for substantive purposes. We review the admission of *Spreigl* evidence [14] for an abuse of discretion. *Blom*, 682 N.W.2d at 611 (citation omitted). The appellant challenging the admission of *Spreigl* evidence bears the burden of showing the error and any resulting prejudice. *Id.*

 Evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith," but it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn. R. Evid. 404(b). Courts examine five factors in deciding whether to admit such evidence: (1) whether the state has given "notice of its intent to admit the evidence"; (2) whether the state has "clearly indicate[d] what the evidence will be offered to prove"; (3) whether there is "clear and convincing evidence that the defendant participated in the prior act"; (4) whether the evidence is "relevant and material to the state's case"; and (5) whether the probative value of the "evidence is outweighed by its potential prejudice to the defendant." *State v. Ness*, 707 N.W.2d 676, 685–86 (Minn.2006).

Here, the *Spreigl* evidence was admitted in the form of a transcript read by an assistant Ramsey County attorney. In the transcript, Clark admitted that on July 25, 1993, while carrying a gun, he entered the bedroom of the victim in her Minneapolis home. Clark further admitted that he showed the victim the gun, causing her to have reasonable fear that he might hurt her, and that he attempted to penetrate the victim with his penis. Clark argues as he did in the district court that the information contained in the transcript is irrelevant and unfairly prejudicial.

As a preliminary matter, we note that the record is not clear on precisely what material fact Clark's prior conviction was admitted to establish. *Id.* at 686. ("In assessing the probative value and need for the evidence, the district court must identify the precise disputed fact to which the *Spreigl* evidence would be relevant." (quotation marks omitted)). The court stated its basis for admitting the evidence as follows:

> In this case the State's case is weak on the issue of intent and accident. It's also weak on the issue of the rape. The defense argues that they are not arguing that this happened by accident. I disagree. The * * * defendant * * * indicated, when he spoke to Officer Doran, that whatever happened to Foster happened by accident, and that he did not intend to kill him. He also rebuts the claim that he intended to rape [B.B.].

The court's reasoning is problematic because the state did not indicate that it intended to offer the *Spreigl* evidence to prove absence of accident, either with respect to Foster or B.B. Moreover, Clark consistently stated in interviews with the police and in his trial testimony that he had *no sexual relations* with B.B. on July

---

14. *See State v. Spreigl,* 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965).

16—thus, the "precise disputed fact" is whether sexual relations occurred at all.

In *State v. Wermerskirchen*, we noted that in prosecutions for rape and sexual abuse, *Spreigl* evidence may be introduced to establish, by showing a common scheme or plan—that a sexual act occurred. 497 N.W.2d 235, 240–41 (Minn.1993). More precisely, we stated that when a defendant contends that the conduct on which the charge was based was "a fabrication," *Spreigl* evidence is admissible to rebut that contention as long as the district court is satisfied that the evidence is sufficiently relevant to the charged crime. Id. at 241–42. The closer the relationship between the past misconduct and the charged offense, "in terms of time, place, or modus operandi, the greater the relevance and probative value of the [*Spreigl*] evidence." *See Ness*, 707 N.W.2d at 688.

Clark's past misconduct and the alleged rape of B.B. are relatively close in terms of place, notwithstanding Clark's assertion to the contrary. Both acts occurred in the same metropolitan area, with the past misconduct occurring at a home in Minneapolis and the alleged rape of B.B. occurring at an apartment in St. Paul.

Regarding proximity in time, Clark's past sexual misconduct occurred 12 years before the alleged rape of B.B., but because Clark was incarcerated for approximately three years for that misconduct, 9 years is a more appropriate characterization of the time span for the purposes of our analysis. *See Wermerskirchen*, 497 N.W.2d at 242 n. 3 (noting that time a defendant spent in prison may be insignificant to the extent the defendant was incapacitated from committing crime). While

we have affirmed the admission of past misconduct that occurred 19 years before the charged crime, *see id.*, we have characterized as "troubling" a time span of 16 years when the defendant was incarcerated for six of those years. *Blom*, 682 N.W.2d at 612. Generally, as the time span increases between the past misconduct and the crime charged, the similarity between the acts in terms of modus operandi must likewise increase in order for the past misconduct to be relevant. *State v. Washington*, 693 N.W.2d 195, 201 (Minn. 2005)

◼ Based on the discussion above, the crux of our inquiry is whether Clark's past misconduct and the alleged rape of B.B. share a sufficiently similar modus operandi such that the past misconduct is relevant despite the 9–year time span. When determining whether past misconduct is admissible under the common scheme or plan exception, the misconduct "must have a *marked similarity* in modus operandi to the charged offense." *Ness*, 707 N.W.2d at 688 (emphasis added). "[I]f the prior crime is simply of the same generic type as the charged offense, it ordinarily should be excluded." *State v. Wright*, 719 N.W.2d 910, 917–18 (Minn.2006) (quoting *State v. Shannon*, 583 N.W.2d 579, 585 (Minn. 1998)).

Here, the only apparent similarities between Clark's past misconduct *as presented to the jury* and the alleged rape of B.B. are (1) both acts involved the use of a gun to threaten the victims; (2) both acts occurred in the victims' bedrooms; and (3) both acts involved vaginal penetration or attempted vaginal penetration.[15] In con-

---

**15.** Argument from the state and defense counsel *outside the presence of the jury* indicated that Clark's prior misconduct, like the alleged rape of B.B., occurred in the early morning hours and targeted an acquaintance of

Clark's. But the argument also revealed that the prior misconduct, unlike the alleged rape of B.B., did not involve a robbery, occurred after Clark and two others broke into the victim's home, and involved oral as well as

trast, in our previous cases affirming the admission of *Spreigl* evidence, the jury was presented with details tending to establish a more distinctive modus operandi. For example, in *Kennedy,* the past misconduct and the crime charged both involved the same victim and "nearly identical" advances, and both incidents occurred in the victim's bedroom. 585 N.W.2d at 391. In *Wright,* both incidents (1) "involved intrusions into homes of vulnerable victims whom the [defendant] had known for some time"; (2) took place "in the early morning hours"; (3) "were preceded by extensive drug use"; (4) were committed with similar weapons; and (5) involved "markedly similar" injuries to the victims. 719 N.W.2d at 918. And in *Blom,* "[b]oth incidents involved the kidnapping of young, petite women to remote, wooded areas" and "also involved subduing the women by applying force at their neck and throat areas." 682 N.W.2d at 612.

Given that Clark's past misconduct is relatively remote in time from the alleged rape of B.B. and the two incidents as described to the jury do not arguably share a "marked similarity," the past misconduct is of modest probative value in establishing a common scheme or plan. But under the last of the five factors identified in our recent *Spreigl* evidence cases, we must nonetheless determine whether that misconduct's probative value, however modest, outweighs its potential to unfairly prejudice Clark. *See e.g., Ness,* 707 N.W.2d at 685–86. Here, the jury learned relatively few details surrounding the past

incident. Further, the length of time between the past incident and Clark's trial lessened the danger that the jury would use the *Spreigl* evidence for improper purposes. These two factors make the potential prejudice to Clark slight.

We conclude that whether to admit Clark's 1994 conviction for substantive purposes in this case is a close call and therefore, the district court abused its discretion when it admitted the evidence. *Id.* at 685 (stating that if the admissibility of *Spreigl* evidence presents "a close call," the evidence should not be admitted).

█ But we will nonetheless affirm the court unless Clark establishes that he was prejudiced by the abuse of discretion. *See State v. Bolte,* 530 N.W.2d 191, 198 (Minn. 1995). "[Our] role is to examine the entire trial record and determine whether there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict * * *." *Id.* (quotation marks omitted). Several factors support a conclusion that in this case, there is no reasonable possibility that the *Spreigl* evidence significantly affected the jury's finding that Clark committed or attempted to commit criminal sexual conduct. As the state asserts, the district court gave a cautionary jury instruction before the *Spreigl* evidence was admitted and before closing argument. Further, the *Spreigl* evidence was introduced to the jury not through compelling live testimony from past victims, but through an assistant county attorney's reading of a 1994 plea hearing transcript—a presentation that

vaginal penetration. Another distinguishing feature between the offenses is that Clark apparently told the victim of his past misconduct that she owed him money, and he disabled two telephones before leaving her home.

Before granting the state's motion to admit the *Spreigl* evidence in this case, the district court expressly found that the alleged rape

*differed* from the past misconduct "because in this case [Clark] deliberately, according to [B.B.'s] testimony, washed the victim's genital area, [and] used a condom to prevent any finding of DNA evidence or semen on the victim." It therefore appears that the district court did not apply the proper analysis in deciding to admit the evidence.

comprised just a few minutes of approximately 9 days of witness testimony. Finally, the state did not refer to the *Spreigl* evidence in its closing argument.

For all of the foregoing reasons, we hold that while the district court abused its discretion when it admitted the *Spreigl* evidence, a new trial is not warranted because Clark did not establish that he was prejudiced by the admission of that evidence.

Affirmed.

HANSON, Justice (dissenting).

I respectfully dissent. I would hold that the district court erred in admitting Clark's post-arraignment statements to police because those statements were obtained through a violation of Rule 4.2 of the Minn. R. Prof. Conduct that was sufficiently egregious to warrant suppression. And, if we need to reach the issue of the denial of Clark's constitutional right to counsel, and his related right against compelled self-incrimination, I would also hold that Clark's constitutional rights were violated.

Perhaps my disagreement with the majority opinion begins, fundamentally, with the supposition that Clark's requests to the jailers that he be able to talk with police created some urgency for the state, which necessitated that the state respond immediately and imposed a similar burden of urgency on defense counsel. Such requests created no greater urgency for the state than a defendant's requests to his jailers that he be let free. There is no basis in the law to conclude that the state has any obligation to act on the request of a defendant to go around his own counsel and initiate conversations with police, especially where the police have improperly urged him to do just that. If there was any urgency here, it was one the police created because the police wanted to talk to Clark without counsel present.

I.

I agree with the principles formulated in the majority opinion concerning Rule 4.2, that, absent a communication that is authorized by law or by a specific court order, the state must obtain counsel's explicit consent before communicating with a represented defendant. I also agree that the state violated those principles when it conducted post-arraignment communications with Clark without counsel's consent. But I disagree with the conclusion of the majority opinion that the post-arraignment communications were not sufficiently egregious to warrant suppression

First, the police adopted a clear strategy to undermine Clark's relationship with his counsel, even before counsel was appointed. In their pre-arraignment interview with Clark, the police were fully aware of and obviously concerned about the limitations they would face in getting access to Clark after counsel was appointed. To avoid those limitations, police persuaded Clark to go around his counsel, misleading Clark into believing that the police would be more attuned to Clark's best interests than would his counsel. During the very first interview, which was going to be brief because Clark was about to be taken to court and would be provided with counsel, Frazer and Doran engaged in this persistent effort to persuade Clark to waive his right to counsel for future interrogations:

> Frazer: They're gonna come and ask to talk to ya in a few minutes and—and you're gonna have to go to court. And if you want to talk to us—lawyer or no lawyer—you can always talk to us. Okay? You know how to get a hold of Mike, and you know how to get a hold of me. But if they interrupt us in a few minutes, and you

gotta go, and you have a lawyer saying, "You don't want to talk to those guys because of the case". What you're telling me piques my curiosity. 'Cause this stuff happened in St. Paul. Mike knows ya from the past and—and that's why we're working together, okay? And the only way for you to get this whole story out is gonna be if you call us and ask to talk to us. If we get interrupted and you haven't told the whole story, okay? So what I'm gonna leave you is my card and you're gonna know how to get a hold of me. And you already know how to get a hold of Mike. And we'll keep going.

\* \* \* \*

Frazer: Do you understand what I'm saying about if we get interrupted though?

Defendant: Yeah [inaudible] his—his people. You know what I'm saying?

Frazer: But you can call us back to tell this story. We can't come and talk to us once you have a lawyer. You would have to call us. Do you understand that?

Defendant: Why is that?

Frazer: Well, it's just the rules. But you're gonna have a lawyer here in a little bit when you go to court.

Defendant: Right.

Doran: And that lawyer might tell you not to talk to us. I can't tell you what to do, you know, that's—that's your choice, but if—if they ask you not to talk to us, and you still want to, you can call either of us.

\* \* \* \*

Frazer: Your attorney's coming—remember—you can talk to us at anytime if they interrupt us, okay? If you want to talk to us, well, you're gonna have to say that you want to talk to us.

Defendant: All right.

Frazer: Even if they tell us you don't want to talk to us, you can still talk to us if you choose to do that.

\* \* \* \*

Frazer: But you gotta call him or me and ya gotta ask us to come see you. You know all ya have to do is tell the jailer, "I want to see Mike Dorn [sic] with Minneapolis and Steve Frazer: with St. Paul."

Defendant: I've been—

Frazer: And we'll help you clear it up, but if you don't ask that—we can't come back and see you.

Defendant: All right.

\* \* \* \*

Frazer: [inaudible] deal with them, I'll talk to you with Mike as much as you would like, but from here out, in a few minutes, you're gonna go into court, and it's gonna be up to you if you call us. And if you don't call us, Mike and I we'll just have to proceed with what we already know, okay? And what other people are saying.

Doran: We can't reach out to you, okay?

Defendant: If I don't call—the only thing I'm going through these withdrawals right now. You know what I'm saying? And I gotta get this out.

Frazer: But if you don't—

Defendant: I'm not feeling right.

Doran: Time's of essence.

Frazer: Yup.

Doran: Time's of essence.

Frazer: Just so you know—if you don't call—then we have to do our job and keep plugging ahead with what other people have told us. And I think you have a lot of important stuff to tell us. 'Cause you're one of the people

who was actually there. Okay? Finish up your smoke and when we're done we'll turn off, and we'll head out, but I thank you for being—you know, straight with Mike. You and I just met, but if we can do something for ya to straighten all this mess out—we'll do it. You don't belong in here if you didn't do this.

\* \* \* \*

Frazer: We're not going anywhere. You have to call us—

Doran: Yeah.

Frazer: As soon as you're done with court, as soon as you're done, if you say to the jailer "I need to talk to Mike and Steve from St. Paul and Minneapolis"—they'll call us on those numbers and we'll come right back.

Doran: Over here. I give you my word.

Defendant: All right.

These conversations had particular significance because Clark had a pre-existing relationship with Doran as a confidential informant and wrongly assumed that Doran would look out for his interest. Doran reinforced that assumption, and attempted to establish a further divide between Clark and any counsel he might obtain, when, according to Clark's unrebutted testimony, he said "I'm your attorney. I can prove better than your attorney. Just do what I'm telling you to do." It is no surprise that Clark later ignored his counsel's advice and sought to talk directly to Doran, who by then had successfully subverted Clark's relationship with any counsel. Although the police thereafter contacted Balck each time Clark asked to speak with them, the use of this protocol cannot be divorced from the prior efforts by police to induce Clark to ignore his counsel, as detailed above.

As will be discussed in section II below, these comments by police violated Clark's right to counsel equally as much as would attempts to persuade a defendant to continue with an interrogation without counsel after the defendant has asked to speak to a lawyer. *See e.g. State v. Hannon*, 636 N.W.2d 796, 806 (Minn.2001) (holding that the police made impermissible inducements by telling a defendant that his side of the story would never be told if he asked for a lawyer); *State v. Munson*, 594 N.W.2d 128, 140–43 (Minn.1999) (holding that police made impermissible inducements by telling a defendant that a window of opportunity would close if he asked for a lawyer).

Second, Frazer testified that Balck played a role in assisting the police to implement their strategy to get access to Clark after counsel was appointed. Frazer said that, because he knew that "once [Clark] had counsel appointed to him, that there were procedures we had to go through before we could talk to him," he "put some things in motion prior to [Clark's post-arraignment request to speak to police]" by contacting Balck to seek his advice on how to proceed after counsel was appointed.

Third, Balck had little specific recall of his attempts to contact defense counsel. He could only say that each time he was contacted by Frazer, he attempted to contact someone from the public defender's office. He did not testify to the content of any specific contact or what response he received from defense counsel. Most importantly, he did not say that he made any attempt to contact counsel on August 2 or before 8:40 p.m. on August 3. In fact, Balck said he could not specifically recall whether Handley or Iversen ever told him that Clark did not want to speak to the police. Obviously, from the testimony of Iversen, we know that she, both directly and through Frazer, told Balck at least

twice that Clark did not want to speak to the police.

The state attempted to fill the gap of Balck's recollection by relying on the hearsay testimony of Frazer, who described his communications with Balck and what Balck told him about Balck's communications with defense counsel. But Frazer's second-hand descriptions actually identified problems with Balck's communications with defense counsel. Frazer reported that Balck told him on July 28 [1] that Balck and Iversen had set a time for police to talk to Clark that day and that Iversen had been told that she could be present. Frazer then reported that when he arrived for the interview, Iversen was present and told Frazer that Clark was not going to be interviewed and said, "You're not going anywhere near my client."

Frazer said that he explained this situation fully to Balck when Clark again asked to meet with police on August 2. He then described Balck's advice on the evening of August 3 as follows:

He told me that a notification had been made to the public defender's office and they were aware of the time, and he said that I could expect to maybe or maybe not—he couldn't answer that—see someone from their office there again, like the earlier date, on the [28th] with Miss Iversen [sic], and irregardless of whether they were there or not there, that I should proceed with the interview.

Of course, we know from Balck's testimony that the only notification he gave before the 9 p.m. August 3 interview was a phone message left at the public defender's main telephone number at 8:40 p.m. Balck had no basis to believe that defense counsel were actually aware of the time or to expect that they might be present.

Fourth, the majority excuses Balck's failure to comply with Rule 4.2 on the grounds that "Balck could reasonably have believed that his obligation under Rule 4.2 was to provide Clark's lawyer with notice and an opportunity to be present at the post-arraignment interviews." But Balck did not testify that he held such a belief. More importantly, Balck acknowledged that he did not fulfill even this lesser obligation, testifying that:

Each time that I received a call from Sergeant Frazer, I would tell him that I was going to make the call to the Public Defender's Office to inform them; and to the best of my recollection, after making that attempt, *whether the contact was made or not,* I would call Sergeant Frazer back and inform him that I had made the attempt or made that contact.

(Emphasis added). Of course, an attempt to contact counsel, by itself, does not constitute actual notice and provides no opportunity to be present.

Balck described his responsibility to be to "attempt to contact" defense counsel. Balck acknowledged that the only time he told Frazer not to talk to Clark was on his first phone call from Frazer on July 26, when he asked Frazer to "wait until I *attempted* to make the call to * * * defense counsel." He did not tell Frazer to hold off interviewing Clark on the evening of August 3rd because he considered that "at 8:40 at night, I made every *attempt* I could to contact the defense attorney or attorneys by leaving a message on the main number, by talking to someone from the answering service."

It is obvious from the extremely short notice, given after hours to a generic main

---

1. Frazer originally said this event occurred on the 29th, but amended his testimony to the 28th.

office telephone, and the authorization for Frazer to proceed even though defense counsel had not actually been contacted, Balck had no intention of providing adequate notice or a real opportunity for counsel to be present for the evening meeting on August 3, but instead considered his responsibility to be over when he attempted contact, no matter how futile that attempt might have been. Balck clearly knew on the evening of August 3 that defense counsel would not have any opportunity to be present for an interview that was to begin only 20 minutes after Balck left the 8:40 p.m. telephone message at the main office. That interview was nearly completed before Balck talked to the public defender's answering service at 10:40 p.m. Thus, any confusion Balck may have had about the precise scope of his legal responsibility does not excuse him because he not only failed to secure defense counsel's consent, he failed to even provide defense counsel with notice and an opportunity to be present.

Fifth, the majority suggests that Balck may have grown frustrated by what he "perceived to have been a lack of responsiveness by the public defender's office." But Balck did not testify to either frustration or lack of responsiveness. To the contrary, he recognized that each time he had contacted defense counsel before August 3, defense counsel had rushed to the jail and persuaded Clark not to meet with police. If Balck was frustrated, it could only be because each time he provided defense counsel with notice and an opportunity to be present, defense counsel did their job and were successful in blocking the interview.

Sixth, I can find no support for the statement of the majority that "there was poor communication between both offices that may have led to frustration on both sides and this frustration may have led to

Balck's lapse in judgment when he did not attempt to prevent the 9 p.m. interview on August 3." I find no basis in the record to suggest that defense counsel communicated poorly with the state or were not timely in their responses to Balck.

It should be remembered that the police contact with Clark spanned only nine days from beginning to end. Although Balck's recall was not specific, from the testimony of Frazer, Handley, and Iversen we can account for the activity of each day and can see that defense counsel responded immediately to every call that provided adequate notice of a proposed meeting with Clark.

On Tuesday, July 26, the day of the arraignment, Clark asked to talk to police after the arraignment and Frazer called Balck, who then talked to Handley. Handley made it clear to Balck that he did not want his client interviewed. He told Balck it would be the better practice to not speak with Clark because it would only create problems later. Of course, Handley could have been more forceful, but his answer was responsive and it did not provide the requisite consent.

On Wednesday, July 27, Clark asked to talk to police and Frazer called Balck, who then called Iversen. Iversen responded immediately by visiting Clark at the jail. Iversen met with Clark for an hour and, when she left, Clark no longer wished to talk to police. Iversen left a message for Balck to that effect on the evening of the 27th.

On Thursday, July 28, Clark called police, Frazer called Balck, Balck called Iversen, and Iversen again visited Clark in Jail. Balck told Frazer that he and Iversen had arranged for a meeting with Clark and police later that day. But after Iversen met with Clark, Clark no longer wanted to meet with police. Iversen found Frazer, who was waiting to interview Clark, and

advised him that Clark did not want to talk to him.

Clark did not make any request to talk to police on Friday, July 29, Saturday, July 30, Sunday, July 31, or Monday, August 1. Clark apparently made such a request on August 2, and Frazer testified that he called Balck, but as the majority notes, it is unclear from Balck's testimony whether he made any attempt to contact defense counsel that day. Balck did not testify to initiating any specific contact and Iversen did not testify to receiving any contact on August 2. The only other attempt to contact defense counsel that Balck described was at 8:40 p.m. on August 3, when he left a telephone message at the main office number, about a 9 p.m. interview of Clark.

Balck did not contradict any of the testimony of Handley and Iversen. Prior to the evening of August 3, defense counsel had responded to each contact from Balck by visiting Clark and reporting to Balck that Clark no longer wished to meet with police. Defense counsel was completely responsive and was not even slightly at fault for any lack of effective communication. In fact, their communication was quite effective in consistently preventing police from meeting with Clark privately. Defense counsel were clear that if police proposed to meet with Clark, defense counsel would intervene, would attempt to persuade Clark not to meet, or would be present if Clark insisted on having a meeting. Of course, the statement attributed to Iversen, that she was "washing her hands" of Clark, was said to have been made on August 4, after the last of Clark's damaging interviews had already been concluded and Iversen was simply responding to the telephone message that Balck had left for her on the evening of August 3.

Finally, I do not share the concern expressed by the majority about the possible infringement on a defendant's "personal autonomy." To the contrary, I believe that both defense counsel and the court have an obligation to safeguard a defendant from the unknowing, unintelligent, or involuntary exercise of personal autonomy that results in the waiver of significant rights. When a defendant wishes to exercise personal autonomy to waive the right to be represented by counsel, he must do so before the court on the record, not in a private meeting with police, and only after being fully advised by the court of the disadvantages. Minn. R.Crim. P. 5.02, subd. 1(4). When a defendant wishes to exercise his personal autonomy to plead guilty to an offense, the court cannot accept that plea without making an extensive record to assure that the plea is knowing, intelligent, and voluntary. Minn. R.Crim. P. 15.01. When a defendant wishes to exercise his personal autonomy to agree to a trial on stipulated facts, the court cannot allow him to do so without making a record to be sure that his waiver of his right to testify is knowing, intelligent, and voluntary. Minn. R.Crim. P. 26.01, subd. 3.

All of these protections against the unwise exercise of personal autonomy are meaningless if a defendant, who has accepted counsel, can be persuaded by the police, in private meetings from which counsel has effectively been excluded, that he need not listen to the advice of counsel, that the police know better than counsel, and that he should talk to the police without counsel present.

I would not compare this situation to that present in *State v. Ford,* 539 N.W.2d 214 (Minn.1995). There, the defendant was truly the party who initiated the contact with police. Here, Clark initiated contact only after having been induced to do so by police, who had undermined his confidence in counsel. In *Ford,* the defendant suggested that he wanted to talk about "a

matter of urgency and a life and death situation," suggesting that he wanted to talk about something other than his involvement in the crime and that some emergency might exist. *Id.* at 223. Clark, on the other hand, was clearly asking to talk to police to follow-up on their invitation to "call us back to tell this story" so they could "help [him] clear it up." Clark's case is more akin to *State v. Lefthand,* 488 N.W.2d 799 (Minn.1992), where the facts were egregious and the administration of justice had been compromised. And Clark's case is even more egregious than *State v. Miller,* 600 . N.W.2d 457 (Minn.1999), because the state effectively precluded Clark's counsel from attending a custodial interrogation, whereas in *Miller* the state only prevented counsel from attending a voluntary, noncustodial interrogation.[2] *See* 600 N.W.2d at 461.

I would hold that the violation of Rule 4.2 was sufficiently egregious to warrant suppression of Clark's post-arraignment statements to police.

## II.

Even if we were not to suppress Clark's post-arraignment statements to police because of the violation of Rule 4.2, I would hold that the statements should be suppressed because the state also violated Clark's right to counsel, under the Sixth Amendment of the United States Constitution and art. I, § 6 of the Minnesota Constitution. The police engaged in persistent efforts to undermine the role of Clark's defense counsel from the beginning to the end of the state's contacts with

Clark. The police began those contacts by urging Clark to ignore his counsel and speak directly to police, suggesting the precise mechanism that Clark needed to use to avoid the involvement of his counsel and misleading Clark into believing that the police were protecting his best interests. And when defense counsel interfered with that strategy, by intervening to protect Clark whenever they were given notice of a proposed meeting, the county attorney took defense counsel out of the picture by authorizing to meet with Clark at a time when defense counsel had not received actual notice and thus was not able to be present. These efforts to bypass defense counsel effectively eliminated Clark's right to counsel.

The efforts of the police to induce Clark to waive his right to have counsel present for future interrogations are also violations of the defendant's related right against compelled self-incrimination under the Fifth Amendment of the United States Constitution and art. I, § 7 of the Minnesota Constitution. The United States Supreme Court has held that police violate a defendant's right against compelled self-incrimination by continuing interrogation after a defendant asserts his right to counsel. *Smith v. Illinois,* 469 U.S. 91, 94–95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (citing *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). And we have held that, after a defendant requests counsel, the interrogating officers must cease all questions except "ones designed to clarify the [defendant's] desires regarding the presence of counsel," and

---

**2.** In *Miller,* we recognized that Rule 4.2 focuses on the conduct of the prosecuting attorney, but we also confirmed that the prosecuting attorney will be held responsible for the conduct of police if the attorney ordered or ratified it. 600 N.W.2d at 464. It could be argued here that the most egregious conduct was that of the police in their pre-arraign-

ment inducements of Clark to ignore his counsel. But the testimony that Frazer contacted Balck even before defense counsel was appointed and that Balck authorized the August 3 interview knowing that defense counsel did not have notice or an opportunity to attend, is sufficient to show that Balck ordered or ratified the conduct of police.

that police statements "designed to induce [defendant] to continue talking [are] improper." *State v. Hannon,* 636 N.W.2d at 806. In fact, we have condemned, as improper inducements, statements that are similar to, and even less offensive, than statements made by Frazer and Doran to Clark. In *Munson,* we said that the detective's reference to a "window of opportunity" that would be closing if the defendant did not continue to answer questions was an impermissible attempt to induce the defendant's waiver of his right to counsel. 594 N.W.2d at 140–43. And in *Hannon,* we said that the police statements that a defendant's "side of [the] story [would] never be known" was an impermissible inducement. 636 N.W.2d at 806. Here, Frazer and Doran were far more forceful than the officers in *Hannon* or *Munson,* stating:

> "And the only way for you to get this whole story out is gonna be if you call us and ask to talk to us.
>
> * * * *
>
> But you can call us back to tell this story.
>
> * * * *
>
> And if you don't call us, [Doran] and I we'll just have to proceed with what we already know, okay? And what other people are saying.
>
> * * * *
>
> Time's of essence.
>
> * * * *
>
> Just so you know—if you don't call—then we have to do our job and keep plugging ahead with what other people have told us."

If the police are precluded from making these types of statements to induce an unrepresented defendant to continue talking without asserting his right to have counsel present, then police are equally precluded from making these types of statements to induce a represented defendant to agree to a later interrogation without his counsel present.

Given the egregious violations of Rule 4.2, I would suppress the second July 26 statement and the August 3 statement of Clark to police. If necessary, I would reach the same result for violations of Clark's constitutional rights to be represented by counsel and to be free of compelled self-incrimination. I would further hold that the admission of those statements was prejudicial error, necessitating a new trial.

PAGE, Justice (dissenting).

I join in the dissent of Justice Hanson.

MEYER, Justice (dissenting).

I join in the dissent of Justice Hanson.

PAGE, Justice (dissenting).

I join in Justice Hanson's dissent. I write separately to make a number of additional points. The court excuses the state's misconduct stating that "based on our existing case law, Balck could reasonably have believed that his obligation under Rule 4.2 was to provide Clark's lawyer with notice and an opportunity to be present at the post-arraignment interviews." The court makes that statement without any explanation as to why Balck's belief could be reasonable. Given the plain, clear, and unambiguous language of Rule 4.2, any belief that the rule required only notice and the opportunity to be present could not be reasonable. The rule provides:

> In representing a client, *a lawyer shall not communicate* about the subject of the representation *with a person the lawyer knows to be represented* by another lawyer in the matter, *unless* the lawyer *has* the *consent* of the other law-

yer *or is authorized* to do so *by law or a court order.*

Minn. R. Prof. Conduct. 4.2 (emphasis added). Comment three to the rule further clarifies: "The rule applies *even though* the represented person initiates or consents to the communication." Minn. R. Prof. Conduct. 4.2 cmt. 3 (emphasis added).

The rule, in its simplicity, cannot be read to require only that the state was obligated to provide notice and the opportunity to be present to Clark's counsel. Nor can our case law. In *Miller*, we clearly stated that "only the party's attorney can approve the direct contact and only the party's attorney can waive the attorney's right to be present during a communication between the attorney's client and opposing counsel." *State v. Miller*, 600 N.W.2d 457, 464 (Minn.1999). This language requires that opposing counsel obtain both the party's attorney's approval for direct contact with the attorney's client and the attorney's waiver of the right to be present during the communication with the attorney's client. Approval and waiver necessarily require the party's attorney to affirmatively act. No affirmative action would be required if mere notice by opposing counsel and the opportunity to be present were sufficient. Here, there is nothing in the record that would support the conclusion that Clark's attorney approved Frazier's and Doran's direct contact with Clark or that Clark's attorney waived the right to be present during any of the communications at issue.

Even if there were some legitimate basis for Balck to have reasonably believed that under Rule 4.2 only notice along with the opportunity to be present was required, indeed, if in fact that was all the rule actually required, the state nonetheless engaged in serious misconduct. Although there is some indication in the record that Clark's attorney may have had notice [1] of the second July 26 communication between Clark, Frazer, and Doran, there has been no showing that Clark's counsel had the *opportunity* to be present. Furthermore, there is nothing in the record before us that would support the conclusion that Clark's counsel ever received adequate notice along with the opportunity to be present during the August 3 communications. Thus, there was no demonstrated compliance with what Balck allegedly thought the rule to be.

There are two final points that must be made. First, the court focuses on the "poor communication" on both sides and Balck's "repeated[ ] attempt[s] to meet what he reasonably believed to be his professional obligations." To the extent that the court's opinion may be read to suggest that Clark's attorneys' failure to respond to the purported notice and opportunity to be present during the communications at issue constitutes consent sufficient to mitigate the misconduct, there is no basis in the law for such a suggestion. Second, I feel compelled to state explicitly that the state's violation of Rule 4.2 cannot be excused or mitigated by the fact that Balck may have been frustrated by the manner in which Clark's attorneys responded or the substance of those responses to the state's efforts to communicate with Clark. In fact, comment six to Rule 4.2 specifically provides that a lawyer may seek a court order to authorize communication with a represented person if "uncertain" whether such communication would be permissible or in "exceptional circumstances." Minn. R. Prof. Conduct. 4.2 cmt. 6. Counsel's

---

**1.** Neither Handley nor Balck positively remember whether they spoke on the day of Clark's arraignment.

frustration does *not* mitigate a violation of the rule; rather, counsel's failure to seek a court order aggravates the misconduct.

For these additional reasons, I respectfully dissent.